# GIBSON ET AL. *v.* BERRYHILL ET AL.

No. 71–653.   Argued January 9–10, 1973—Decided May 7, 1973

WHITE, J., delivered the opinion for a unanimous Court. BURGER, C. J., filed a concurring opinion, *post*, p. 581. MARSHALL, J., filed a concurring opinion, in which BRENNAN, J., joined, *post*, p. 581.

*Richard A. Billups, Jr.,* argued the cause for appellants. With him on the brief were *William Baxley,* Attorney General of Alabama, and *J. G. L. Marston III* and *Donald George Valeska II,* Assistant Attorneys General.

*Harry Cole* argued the cause for appellees. With him on the brief were *James J. Carter* and *Douglas E. Bergman.*

MR. JUSTICE WHITE delivered the opinion of the Court.

Prior to 1965, the laws of Alabama relating to the practice of optometry permitted any person, including a business firm or corporation, to maintain a department in which "eyes are examined or glasses fitted," provided that such department was in the charge of a duly licensed optometrist. This permission was expressly conferred by § 210 of Title 46 of the Alabama Code of 1940, and also inferentially by § 211 of the Code which regulates the

advertising practices of of optometrists, and which, until 1965, appeared to contemplate the existence of commercial stores with optical departments.[1]  In 1965, § 210 was repealed in its entirety by the Alabama Legislature, and § 211 was amended so as to eliminate any direct reference

---

[1] Sections 210 and 211 of c. 11, Tit. 46, of the Code of Alabama, 1940, provided, prior to 1965, as follows:

"§ 210. Store where glasses are sold; how department conducted.— Nothing in this chapter shall be so construed as to prevent any person, firm, or corporation from owning or operating a store or business establishment wherein eyes are examined or glasses fitted; provided, that such store, establishment, or optometric department shall be in charge of a duly licensed optometrist, whose name must appear on and in all optometry advertising of whatsoever nature done by said person, firm or corporation."

"§ 211. False or misleading statements in advertisements or stores having optometry department.—It shall be unlawful for any person, firm or corporation, engaged in the practice of optometry in this state, to print or cause to be printed, or circulate or cause to be circulated, or publish, by any means whatsoever, any advertisement or circular in which appears any untruthful, impossible, or improbable or misleading statement or statements, or anything calculated or intended to mislead or deceive the public.  And it shall be unlawful for any individual, firm or corporation, engaged in the sale of goods, wares or merchandise who maintains or operates, or who allows to be maintained and operated in connection with said mercantile business an optometry department; or who rents or subleases to any person or persons for the purpose of engaging in the practice of optometry therein, any portion of or space in said store, premises or establishment in which such person, firm or corporation is engaged in said mercantile business, to publish, or circulate, or print or cause to be printed, by any means whatsoever, any advertisement or notice of the optometry department maintained, operated, or conducted in said establishment or place of business, in which said advertisement or notice appear any untruthful, improbable, impossible, or misleading statement or statements, or anything calculated to mislead or deceive the public."

Sections 190–213, regulating the practice of optometry in Alabama, were originally adopted in 1919.

to optical departments maintained by corporations or other business establishments under the direction of employee optometrists.[2]

Soon after these statutory changes, the Alabama Optometric Association, a professional organization whose membership is limited to independent practitioners of optometry *not* employed by others, filed charges against various named optometrists, all of whom were duly licensed under Alabama law but were the salaried employees of Lee Optical Co. The charges were filed with the Alabama Board of Optometry, the statutory body with authority to issue, suspend, and revoke licenses for the practice of optometry. The gravamen of these charges was that the named optometrists, by accepting employment from Lee Optical, a corporation, had engaged in "unprofessional conduct" within the meaning of § 206 of the Alabama optometry statute, and hence were practicing their profession unlawfully.[3] More particularly,

---

[2] Section 211, as amended, reads as follows:

"§ 211. False or misleading statements in advertisements or circulars.—It shall be unlawful for any person engaged in the practice of optometry in this state to print or cause to be printed, or circulate or cause to be circulated, or published, by any means whatsoever, any advertisement or circular in which appears any untruthful, impossible, or improbable or misleading statement or statements, or anything calculated or intended to mislead or deceive the public."

[3] Section 206, insofar as relevant here, provides as follows:

"§ 206. License may be suspended or revoked.—A license issued to any person may be suspended for a definite period of time, or revoked by the state board of optometry for any of the following reasons; to-wit: . . . For unprofessional conduct. 'Unprofessional conduct' shall be defined to mean any conduct of a character likely to deceive or defraud the public, lending his license by any licensed optometrist to any person, the employment of 'cappers,' or 'steerers' to obtain business, 'splitting' or dividing a fee with any person or persons, the obtaining of any fee or compensation by fraud or mis-

the Association charged the named individuals with, among other things, aiding and abetting a corporation in the illegal practice of optometry; practicing optometry under a false name, that is, Lee Optical Co.; unlawfully soliciting the sale of glasses; lending their licenses to Lee Optical Co.; and splitting or dividing fees with Lee Optical.[4] It was apparently the Association's position that, following the repeal of § 210 and the amendment of § 211, the practice of optometry by individuals as employees of business corporations was no longer permissible in Alabama, and that, by accepting such employment, the named optometrists had violated the ethics of their profession. It was prayed that the Board revoke the licenses of the individuals charged following due notice and a proper hearing.

Two days after these charges were filed by the Association in October 1965, the Board filed a suit of its own in state court against Lee Optical, seeking to enjoin the company from engaging in the "unlawful practice of optometry." The Board's complaint also named 13 optometrists employed by Lee Optical as parties defendant,

representation, employing directly or indirectly any suspended or unlicensed optometrist to do any optometrical work, by use of any advertising, carrying the advertising of articles not connected with the profession, the employment of any drugs or medicines in his practice unless authorized to do so by the laws covering the practice of medicine of this state, or the doing or performing of any acts in his profession declared by the Alabama Optometric Association to be unethical or contrary to good practice."

The section also provides for a hearing before the Board upon due notice of an accused license holder. At such a hearing the accused is entitled to be represented by counsel, to cross-examine the witnesses against him, and to have all testimony taken down by a stenographer.

[4] Some of the charges leveled against the named optometrists are covered by sections of the Alabama optometry statute other than § 206, e. g., "practicing optometry under a false name" (§ 191), "unlawfully soliciting the sale of glasses" (§ 203), etc.

charging them with aiding and abetting the company in its illegal activities, as well as with other improper conduct very similar to that charged by the Association in its complaint to the Board.

Proceedings on the Association's charges were held in abeyance by the Board while its own state court suit progressed. The individual defendants in that suit were dismissed on grounds that do not adequately appear in the record before us; and, eventually, on March 17, 1971, the state trial court rendered judgment for the Board, and enjoined Lee Optical both from practicing optometry without a license and from employing licensed optometrists.[5] The company appealed this judgment.

Meanwhile, following its victory in the trial court, the Board reactivated the proceedings pending before it since 1965 against the individual optometrists employed by Lee, noticing them for hearings to be held on May 26 and 27, 1971. Those individuals countered on May 14, 1971, by filing a complaint in the United States District Court naming as defendants the Board of Optometry and its individual members, as well as the Alabama Optometric Association and other individuals. The suit, brought under the Civil Rights Act of 1871, 42 U. S. C. § 1983, sought an injunction against the scheduled hearings on the grounds that the statutory scheme regulating the practice of optometry in Alabama[6] was unconstitutional

---

[5] A period of nearly five and one-half years passed between the filing of the Board's complaint against Lee Optical, and the decision of the state trial court. Much of this delay appears to be attributable to certain procedural wranglings in the court concerning whether the Board had the power to bring an injunctive action against those it believed to be practicing optometry unlawfully. During the pendency of the litigation, the Alabama Legislature passed a statute expressly conferring such power, both prospectively and retroactively, on state licensing boards, and the suit appears to have proceeded expeditiously thereafter.

[6] §§ 190–213 of c. 11, Tit. 46, of the Alabama Code of 1940.

insofar as it permitted the Board to hear the pending charges against the individual plaintiffs in the federal suit.[7] The thrust of the complaint was that the Board was biased and could not provide the plaintiffs with a fair and impartial hearing in conformity with due process of law.

A three-judge court was convened in August 1971, and shortly thereafter entered judgment for plaintiffs, enjoining members of the State Board and their successors "from conducting a hearing on the charges heretofore preferred against the Plaintiffs" and from revoking their licenses to practice optometry in the State of Alabama.

In its supporting opinion, 331 F. Supp. 122, the District Court first considered whether it should stay its hand and defer to the then-pending state proceedings—that is, whether the situation presented was one which would permit of immediate federal intervention to restrain the actions of a state administrative body. That question was answered in the affirmative, the court holding that 28 U. S. C. § 2283, the federal anti-injunction statute, was not applicable to state administrative proceedings even where those proceedings were adjudicatory in character. Moreover, the District Court also held that neither *Younger* v. *Harris,* 401 U. S. 37 (1971), nor the doctrine normally requiring exhaustion of administrative remedies forbade a federal injunction where, as the court found to be true here, the administrative process was so defective and inadequate as to deprive the plaintiffs of due process of law.

This conclusion with respect to the deficiencies in the pending proceedings against plaintiffs, although an amalgam of several elements, amounted basically to a sustain-

---

[7] More specifically, the plaintiffs attacked §§ 206 and 192 of the statute which provide, respectively, that the Board shall have the power to entertain delicensing proceedings and that its membership shall be limited to members of the Alabama Optometric Association.

ing of the plaintiffs' allegation of bias. For the District Court, the inquiry was not whether the Board members were "actually biased but whether, in the natural course of events, there is an indication of a possible temptation to an average man sitting as a judge to try the case with bias for or against any issue presented to him." 331 F. Supp., at 125. Such a possibility of bias was found to arise in the present case from a number of factors. First, was the fact that the Board, which acts as both prosecutor and judge in delicensing proceedings, had previously brought suit against the plaintiffs on virtually identical charges in the state courts. This the District Court took to indicate that members of the Board might have "preconceived opinions" with regard to the cases pending before them. Second, the court found as a fact that Lee Optical Co. did a large business in Alabama, and that if it were forced to suspend operations the individual members of the Board, along with other private practitioners of optometry, would fall heir to this business. Thus, a serious question of a personal financial stake in the matter in controversy was raised. Finally, the District Court appeared to regard the Board as a suspect adjudicative body in the cases then pending before it, because only members of the Alabama Optometric Association could be members of the Board, and because the Association excluded from membership optometrists such as the plaintiffs who were employed by other persons or entities. The result was that 92 of the 192 practicing optometrists in Alabama were denied participation in the governance of their own profession.

The court's ultimate conclusion was "that to require the Plaintiffs to resort to the protection offered by state law in these cases would effectively deprive them of their property, that is, their right to practice their professions, without due process of law and that irreparable injury

would follow in the normal course of events." [8]   331 F. Supp., at 126.

Appeal was taken to this Court and probable jurisdiction noted on June 26, 1972.   408 U. S. 920.   Meanwhile, on March 30, 1972, the Supreme Court of Alabama reversed the judgment of the state trial court in the *Lee Optical Co.* case,[9] holding that nothing in the Alabama statutes pertaining to optometry evidenced "a legislative policy that an optometrist duly qualified and licensed under the laws of this state, may not be employed by another to examine eyes for the purpose of prescribing eyeglasses." [10]   288 Ala. 338, 346, 261 So. 2d 17, 24.

It is against this procedural background that we turn to a consideration of the issues presented by this appeal.

## I

We agree with the District Court that neither statute nor case law precluded it from adjudicating the issues before it and from issuing the injunction if its decision on the merits was correct.

Title 28 U. S. C. § 2283, the anti-injunction statute, prohibits federal courts from enjoining state court proceedings, but the statute excepts from its prohibition in-

---

[8] The District Court also dismissed, without prejudice, the Board's counterclaim in the present suit which sought a judgment barring the plaintiffs from practicing optometry in Alabama.

[9] See *Lee Optical Co. of Alabama* v. *State Board of Optometry,* 288 Ala. 338, 261 So. 2d 17, rehearing denied Apr. 27, 1972.

[10] In a companion case, *House of $8.50 Eyeglasses* v. *State Board of Optometry,* 288 Ala. 349, 261 So. 2d 27 (1972), the Alabama Supreme Court reversed the judgment of another lower state court which had enjoined a corporation from unlawfully practicing optometry through its optometrist employees.   In that case, the individual optometrists involved were also enjoined from unlawfully practicing their profession.   Both injunctions were dissolved by the Alabama Supreme Court.

junctions which are "expressly authorized" by another Act of Congress.[11] Last Term, after the District Court's decision here, this Court determined that actions brought under the Civil Rights Act of 1871, 42 U. S. C. § 1983, were within the "expressly authorized" exception to the ban on federal injunctions.[12] *Mitchum* v. *Foster*, 407 U. S. 225 (1972).

Our decision in *Mitchum,* however, held only that a district court was not absolutely barred by statute from enjoining a state court proceeding when called upon to do so in a § 1983 suit. As we expressly stated in *Mitchum,* nothing in that decision purported to call into question the established principles of equity, comity, and federalism which must, under appropriate circumstances, restrain a federal court from issuing such injunctions. *Id.,* at 243. These principles have been emphasized by this Court many times in the past, albeit under a variety of different rubrics. First of all, there is the doctrine, usually applicable when an injunction is sought, that a party must exhaust his available administrative remedies before invoking the equitable jurisdiction of a court. See, *e. g., Prentis* v. *Atlantic Coast Line Co.,* 211 U. S. 210 (1908); *Illinois Commerce Comm'n* v. *Thomson,* 318 U. S. 675 (1943). Secondly, there is the basic principle of federalism, restated as recently as 1971 in *Younger* v. *Harris,* 401 U. S. 37, that a federal court may not

---

[11] Title 28 U. S. C. § 2283 provides:

"A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments."

[12] The District Court held § 2283 inapplicable in the present case because the plaintiffs sought an injunction against a state administrative body and not a state court. Whether this distinction is tenable in all circumstances—even where the administrative proceeding is adjudicatory or quasi-judicial in character—we need not decide here since the present action was brought under 42 U. S. C. § 1983.

enjoin a pending state criminal proceeding in the absence of special circumstances suggesting bad faith, harassment or irreparable injury that is both serious and immediate. And finally, there is the doctrine, developed in our cases at least since *Railroad Comm'n* v. *Pullman Co.*, 312 U. S. 496 (1941), that when confronted with issues of constitutional dimension which implicate or depend upon unsettled questions of state law, a federal court ought to abstain and stay its proceedings until those state law questions are definitively resolved.

In the instant case the matter of exhaustion of administrative remedies need not detain us long. Normally when a State has instituted administrative proceedings against an individual who then seeks an injunction in federal court, the exhaustion doctrine would require the court to delay action until the administrative phase of the state proceedings is terminated, at least where coverage or liability is contested and administrative expertise, discretion, or factfinding is involved.[18] But this Court has expressly held in recent years that state administrative remedies need not be exhausted where the federal court plaintiff states an otherwise good cause of action under 42 U. S. C. § 1983. *McNeese* v. *Board of Education*, 373 U. S. 668 (1963); *Damico* v. *California*, 389 U. S. 416 (1967). Whether this is invariably the case even where, as here, a license revocation proceeding has been brought by the State and is pending before one of its own agencies and where the individual charged is to be deprived of

---

[18] This exhaustion requirement does not apply generally to state "judicial," as opposed to "administrative," remedies. See *Bacon* v. *Rutland R. Co.*, 232 U. S. 134 (1914); *City Bank Farmers Trust Co.* v. *Schnader*, 291 U. S. 24 (1934). The doctrine of exhaustion of administrative remedies should, however, be kept distinct from other equitable doctrines such as those exemplified in *Younger* v. *Harris*, 401 U. S. 37 (1971), and *Railroad Comm'n* v. *Pullman Co.*, 312 U. S. 496 (1941), which do require a federal court to defer in appropriate circumstances to state *judicial* proceedings.

nothing until the completion of that proceeding, is a question we need not now decide; for the clear purport of appellees' complaint was that the State Board of Optometry was unconstitutionally constituted and so did not provide them with an adequate administrative remedy requiring exhaustion. Thus, the question of the adequacy of the administrative remedy, an issue which under federal law the District Court was required to decide, was for all practical purposes identical with the merits of appellees' lawsuit.[14]

## II

This brings us to the question of whether *Younger* v. *Harris*, 401 U. S. 37 (1971); *Samuels* v. *Mackell*, 401 U. S. 66 (1971), or the principles of equity, comity, and federalism for which those cases stand, precluded the District Court from acting, in view of the fact that proceedings against appellees were pending before the Alabama Board of Optometry. Those cases and principles would, under ordinary circumstances, forbid either a declaratory judgment or injunction with respect to the validity or enforcement of a state statute when a criminal proceeding under the statute has been commenced. Whether a like rule obtains where state civil proceedings are pending was left open in *Younger* and its companion cases.

---

[14] State administrative remedies have been deemed inadequate by federal courts, and hence not subject to the exhaustion requirement, on a variety of grounds. Most often this has been because of delay by the agency, *Smith* v. *Illinois Bell Tel. Co.*, 270 U. S. 587 (1926), or because of some doubt as to whether the agency was empowered to grant effective relief, *Union Pac. R. Co.* v. *Board of Comm'rs of Weld County*, 247 U. S. 282 (1918); *McNeese* v. *Board of Education*, 373 U. S. 668 (1963). State administrative remedies have also been held inadequate, however, where the state administrative body was found to be biased or to have predetermined the issue before it. *Kelly* v. *Board of Education*, 159 F. Supp. 272 (MD Tenn. 1958).

Appellants now insist, not only that the issue is posed here by the pendency of proceedings before the state board, but also that the issue was actually decided following *Younger* by our summary affirmance in the case of *Geiger* v. *Jenkins*, 401 U. S. 985 (1971). In that case, the State Medical Board of Georgia noticed hearings on charges filed against a medical practitioner who immediately brought suit in federal court under § 1983 seeking an injunction on the ground that the underlying statute the Medical Board sought to enforce was unconstitutional. The District Court dismissed the action without reaching the merits, holding that the state proceedings were "in the nature of criminal proceedings," sufficiently so in any event to trigger the 28 U. S. C. § 2283 bar to federal intervention. 316 F. Supp. 370, 372 (ND Ga. 1970). The decision was appealed to this Court and summarily affirmed without opinion but with citation to *Younger* and *Mackell*.

As frequently occurs in the case of summary affirmance, the decision in *Geiger* is somewhat opaque. We doubt, however, that it is controlling here. First of all, it appears from the jurisdictional statement and motion to affirm in *Geiger* that state criminal proceedings were pending at the time of the challenged dismissal of the federal case. Moreover, it also appears that subsequent to that dismissal the State Medical Board completed its proceedings and revoked Geiger's license, and that judicial proceedings to review that order were already under way in the state courts. Secondly, there is no judicial finding here as there was in *Geiger* that under applicable state law license revocation proceedings are quasi-criminal in nature; nor is the Alabama case law now cited for this proposition persuasive. See *State* v. *Keel*, 33 Ala. App. 609, 35 So. 2d 625 (1948). Finally, although it is apparent from *Geiger* that administrative proceedings looking toward the revocation of a license to practice

medicine may in proper circumstances command the respect due court proceedings, there remains the claim here, not present in *Geiger,* that the administrative body itself was unconstitutionally constituted, and so not entitled to hear the charges filed against the appellees.

Unlike those situations where a federal court merely abstains from decision on federal questions until the resolution of underlying or related state law issues[15]—a subject we shall consider shortly in the context of the present case—*Younger* v. *Harris* contemplates the outright dismissal of the federal suit, and the presentation of all claims, both state and federal, to the state courts. Such a course naturally presupposes the opportunity to raise and have timely decided by a competent state tribunal the federal issues involved. Here the predicate for a *Younger* v. *Harris* dismissal was lacking, for the appellees alleged, and the District Court concluded, that the State Board of Optometry was incompetent by reason of bias to adjudicate the issues pending before it. If the District Court's conclusion was correct in this regard, it was also correct that it need not defer to the Board. Nor, in these circumstances, would a different result be required simply because judicial review, *de novo* or otherwise, would be forthcoming at the conclusion of the administrative proceedings.[16] Cf. *Ward* v. *Village of Monroeville,* 409 U. S. 57 (1972).

---

[15] See, *e. g., Railroad Comm'n* v. *Pullman Co., supra; England* v. *Louisiana State Bd. of Medical Exam'rs,* 375 U. S. 411 (1964); *Lake Carriers' Assn.* v. *MacMullan,* 406 U. S. 498 (1972).

[16] This Court was assured at oral argument by counsel for both parties that Alabama law provides for *de novo* court review of delicensing orders issued by the Board. Tr. of Oral Arg. 5, 19. Nonetheless, the District Court expressly found that the revocation by the Board of appellees' licenses to practice their profession, "together with the attendant publicity which would inevitably be associated therewith, would cause irreparable damage" to the appellees for which no adequate remedy is afforded by state law. 331 F. Supp. 122, 126.

## III

It is appropriate, therefore, that we consider the District Court's conclusions that the State Board of Optometry was so biased by prejudgment and pecuniary interest that it could not constitutionally conduct hearings looking toward the revocation of appellees' licenses to practice optometry. We affirm the District Court in this respect.

The District Court thought the Board to be impermissibly biased for two reasons. First, the Board had filed a complaint in state court alleging that appellees had aided and abetted Lee Optical Co. in the unlawful practice of optometry and also that they had engaged in other forms of "unprofessional conduct" which, if proved, would justify revocation of their licenses. These charges were substantially similar to those pending against appellees before the Board and concerning which the Board had noticed hearings following its successful prosecution of Lee Optical in the state trial court.

Secondly, the District Court determined that the aim of the Board was to revoke the licenses of all optometrists in the State who were employed by business corporations such as Lee Optical, and that these optometrists accounted for nearly half of all the optometrists practicing in Alabama. Because the Board of Optometry was composed solely of optometrists in private practice for their own account, the District Court concluded that success in the Board's efforts would possibly redound to the personal benefit of members of the Board, sufficiently so that in the opinion of the District Court the Board was constitutionally disqualified from hearing the charges filed against the appellees.

The District Court apparently considered either source of possible bias—prejudgment of the facts or personal interest—sufficient to disqualify the members of the Board.

Arguably, the District Court was right on both scores, but we need reach, and we affirm, only the latter ground of possible personal interest.[17]

It is sufficiently clear from our cases that those with substantial pecuniary interest in legal proceedings should not adjudicate these disputes. *Tumey* v. *Ohio*, 273 U. S. 510 (1927). And *Ward* v. *Village of Monroeville*, 409 U. S. 57 (1972), indicates that the financial stake need not be as direct or positive as it appeared to be in *Tumey*. It has also come to be the prevailing view that "[m]ost of the law concerning disqualification because of interest applies with equal force to . . . administrative adjudicators." K. Davis, Administrative Law Text § 12.04, p. 250 (1972), and cases cited. The District Court proceeded on this basis and, applying the standards taken from our cases, concluded that the pecuniary interest of the members of the Board of Optometry had sufficient substance to disqualify them, given the context in which this case arose. As remote as we are from the local realities underlying this case and it being very likely that the District Court has a firmer grasp of the facts and of their significance to the issues presented, we have no good reason on this record to overturn its conclusion and we affirm it.

## IV

Finally, we do not think that the doctrine of abstention, as developed in our cases from *Railroad Comm'n* v.

---

[17] The extent to which an administrative agency may investigate and act upon the material facts of a case and then, consistent with due process, sit as an adjudicative body to determine those facts finally has occasioned some divergence of views among federal courts. Compare *Amos Treat & Co.* v. *SEC*, 113 U. S. App. D. C. 100, 306 F. 2d 260 (1962), and *Trans World Airlines* v. *CAB*, 102 U. S. App. D. C. 391, 254 F. 2d 90 (1958), with *Pangburn* v. *CAB*, 311 F. 2d 349 (CA1 1962). See also *Mack* v. *Florida State Board of Dentistry*, 296 F. Supp. 1259 (SD Fla. 1969). We have no occasion to pass upon this issue here in view of our disposition of the present case.

*Pullman Co.,* 312 U. S. 496 (1941), to *Lake Carriers' Assn.*
v. *MacMullan,* 406 U. S. 498 (1972), required the District
Court to stay its proceedings until the appellees had pre-
sented unsettled questions of state law to the state courts.
Those questions went to the reach and effect of the state
optometry law and concerned the merits of the charges
pending against the appellees, at the heart of which was
the issue whether Alabama law permitted licensed op-
tometrists to be employed by business corporations and
others. That central question was pending in the Ala-
bama Supreme Court in the *Lee Optical Co.* case at
the time the District Court entered its order. As was
noted earlier, however, appellees here had been dismissed
from that case by the state trial court, and it was only
after this dismissal, and after the Board had reactivated
its charges against them, that appellees sought relief in
federal court.

Arguably, the District Court should have awaited the
outcome of the *Lee Optical Co.* appeal, a decision which
might have obviated the need for an injunction in this
case.[18] But the Board was pressing its charges against
appellees without awaiting that outcome and, in any
event, it appears that at least some of the charges pend-
ing against appellees might have survived a reversal of
the state trial court's judgment by the Alabama Supreme
Court. Under these circumstances, it was not an abuse
of discretion for the District Court to proceed as it did.

Nevertheless, the Alabama Supreme Court has since
rendered its decision, not only in the *Lee Optical Co.* case,
but also in a companion case, *House of $8.50 Eyeglasses*
v. *State Board of Optometry,* 288 Ala. 349, 261 So. 2d 27
(1972). See n. 10, *supra.* Individual optometrists were
parties to that latter case, and the Alabama Supreme
Court entered judgment in their behalf, holding that noth-

---

[18] See *Askew* v. *Hargrave,* 401 U. S. 476 (1971).

ing in the State's optometry law prohibited a licensed optometrist from accepting employment from a business corporation. Whether this judgment substantially devitalizes the position of the Board with respect to the appellees here, or in any way makes unnecessary or removes the "equity" from the injunction entered by the District Court, we are unable to determine. But we do think that considerations of equity, comity, and federalism warrant vacating the judgment of the District Court and remanding the case to that court for reconsideration in light of the Alabama Supreme Court's judgments in the *Lee Optical Co.* and *House of $8.50 Eyeglasses* cases. We in no way intimate whether or not the injunction should be reinstated by the District Court.

*It is so ordered.*

MR. CHIEF JUSTICE BURGER, concurring.

I concur, although in my view the three-judge District Court would have been better advised, as a matter of sound judicial discretion, to have refrained from acting until the outcome of the *Lee Optical* appeal. See my dissenting opinion in *Wisconsin* v. *Constantineau,* 400 U. S. 433, 443 (1971).

MR. JUSTICE MARSHALL, with whom MR. JUSTICE BRENNAN joins, concurring.

I join the opinion of the Court except insofar as it suggests that the question remains open whether plaintiffs in some suits brought under 42 U. S. C. § 1983 may have to exhaust administrative remedies. See *ante,* at 574–575. In my opinion, the inapplicability of the exhaustion requirement to any suit brought under § 1983 has been firmly settled by this Court's prior decisions, *McNeese* v. *Board of Education,* 373 U. S. 668, 671–672 (1963). See also *Houghton* v. *Shafer,* 392 U. S. 639 (1968); *King* v. *Smith,* 392 U. S. 309, 312 n. 4 (1968); *Damico* v. *California,* 389 U. S. 416 (1967).