David C. COUPER, Plaintiff,

v.

**MADISON BOARD OF POLICE AND FIRE COMMISSIONERS et al.,** Defendants.

No. 74–C–17.

United States District Court,
W. D. Wisconsin.

Jan. 25, 1974.

John H. Bowers, Madison, Wis., for plaintiff.

OPINION AND ORDER

JAMES E. DOYLE, District Judge.

This opinion and order are directed to plaintiff's request that a three-judge

court be convened pursuant to 28 U.S.C. §§ 2281–2284, and to plaintiff's motion for a temporary restraining order pursuant to 28 U.S.C. § 2284(3).

A hearing has been held on the motion for a temporary restraining order, at which the plaintiff and the defendants were afforded an opportunity to be heard, as were an Assistant Attorney General of the State of Wisconsin and an attorney for seven members of the Madison Police Department who filed a statement of charges against the chief on December 28, 1973, with the defendant Board. A brief and a letter-brief in support of the motion have been filed by the plaintiff. An uninvited letter-brief and an uninvited brief have been filed by the said attorney for the seven members of the police department; these briefs have not been considered by the court.

For the purpose of this opinion and order, but for no other purpose, it will be assumed that the facts are as alleged in the verified complaint and in the affidavits filed herein on plaintiff's behalf (including affidavits filed in proceedings before the defendant Board of Police and Fire Commissioners).

### Facts as Alleged

Plaintiff has been chief of police of the City of Madison, Wisconsin, since about December 20, 1972.

On or about December 28, 1973, seven members of the police department filed with the defendant Board of Police and Fire Commissioners a verified statement of charges against the chief, based in part upon their own knowledge and in part upon their information and belief, together with a "statement of source of information," also verified, in which they listed the names and addresses of witnesses whom they believed to have knowledge of the incidents referred to in the statement of charges. The seven officers requested that the Board conduct a hearing on the charges, then make findings that the charges have been sustained, and then take appropriate action against the chief.

Thereafter, the Board provided for hearings upon said charges; the hearings commenced January 17, 1974. Prior to, and at the opening of said hearings, counsel for the chief submitted a series of motions to the Board, among which were a motion for additional time to prepare, a motion that the Board disqualify itself to hear the charges against the chief, and motions that Commissioners Liddicoat, Somers, and Swenson disqualify themselves. All the said motions were denied. (I have been informed by counsel, and find as fact, that the hearings have been recessed until January 28, 1974.)

A. *Facts as alleged with respect to disqualification of the Board, and with respect to unconstitutionality of Section 62.13(5), Wis.Stat.*

On or about August 2, 1973, there was delivered to the defendant president of the Board an unverified document entitled "petition," addressed to the Board, and signed by about 103 members of the police department. The petition alleged that there was a serious morale problem in the police department; that there were serious rumors about fraud, mistrust, and mismanagement which might or might not be true; and that these problems had become apparent on an increasing scale after January, 1973. The petitioners requested the Board to conduct an investigation of the police department and of the chief "for clarification of all above matters," and also requested the Board "that certain precautions be given toward [the petitioners] . . . from retaliation by management."

On August 8, 1973, the Board decided to conduct an investigation of the matters referred to in the August 2 petition, and to hire a staff member to carry it out. The Board requested the City Council to provide funds for the investigation, but on August 14 the City Council refused the Board's request; "rejected" the August 2 petition; requested the Board to "follow through on specific charges;" and resolved that "if such

charges were found," the City Council "will authorize an investigation." On August 23, 1973, the City Attorney advised the Board that it lacked jurisdiction to proceed with an investigation based on the August 2 petition, but the Board refused to dismiss the August 2 petition and decided to hire a staff member to carry out an investigation based on the August 2 petition.

On August 24, the defendant president of the Board requested Russell Mittelstadt to conduct an investigation and to report his findings, conclusions, and recommendations to the Board within 60 days, and on August 28 Mittelstadt agreed to do so. On August 30, the City Council refused to provide funds for the Mittelstadt investigation.

On September 19, the Board dismissed the August 2 petition because no verified petition had been filed by that date.

On September 19, an "interim report" was delivered to the defendant president of the Board by Mittelstadt. Copies were prepared for each member of the Board. Mittelstadt continued his investigation and on December 15 filed his final report with the Board.

From August 23 until October 17, the Board refused the chief's request for disclosure of the names of the signers of the August 2 petition, but then disclosed them.

From September 19 until November 24, the Board refused the chief access to the September 19 interim report of Mittelstadt. On November 24, the Board made the said interim report public. The December 15 final report of Mittelstadt was made public on that date.

During the period of his investigation from August 28 to December 15, Mittelstadt provided the chief with no opportunity to respond to charges made against him to Mittelstadt by others, nor was the chief provided an opportunity to confront or to cross-examine those who communicated to Mittelstadt charges against the chief. The interim and final reports of Mittelstadt were replete with hearsay and unverified accusations.

The content of the statement of charges filed with the Board by the seven members of the department on December 28 corresponds closely to the content of the interim and final reports of Mittelstadt. A major issue, and probably the dominant issue, raised by the charges is whether the morale of department personnel is low and, if so, what has caused this condition.

B. *Facts as alleged with respect to disqualification of Commissioners Liddicoat, Somers, and Swenson.*

Most, if not all, of the critical decisions adverse to the chief made by the Board between August 2 and the present were by three to two votes, with defendant Commissioners Liddicoat, Somers, and Swenson in the majority.

1. *Liddicoat*

Defendant Commissioner Liddicoat and her husband have enjoyed a close social relationship for a substantial period of time with Roth Watson and his wife. Roth Watson is a member of the police department and he is one of the seven police officers who filed the December 28 statement of charges against the chief. Both Roth Watson and defendant Commissioner Liddicoat have stated to the plaintiff that Roth Watson had supported the appointment of the plaintiff as chief when the Board was making its choice in December, 1972. Roth Watson has stated to the chief that it was Roth Watson who persuaded Commissioner Liddicoat to cast her vote for the chief's appointment. Roth Watson has since sought from the chief a promotion within the department. Defendant Commissioner Liddicoat has stated to the chief and to the wife of the chief that Roth Watson should be promoted. The wife of defendant Commissioner Swenson has stated that Roth Watson's support of the plaintiff was the sole reason why Commissioner Liddicoat voted for the appointment of the plaintiff as chief.

## 2. *Somers*

Defendant Commissioner Somers is the plaintiff in an action for defamation presently pending in the Circuit Court for Dane County, Wisconsin. The verification of his complaint in that action was made on August 23, 1973. The defendant in said action is Paul R. Soglin, who is presently the mayor of the City of Madison. The essence of the complaint is that on August 20, 1973, and immediately thereafter, the defendant Soglin made statements to representatives of the news media to the effect that Commissioner Somers had been guilty of improper conduct and influence-peddling with respect to seeking promotions of certain police officers within the department. Compensatory damages are prayed for in the sum of $500,000, and punitive damages in the sum of $1,000,000. The attorney for Commissioner Somers has taken the deposition of the defendant Soglin in the lawsuit, and has asked the defendant Soglin several questions about conversations between Soglin and the chief concerning the Board. The attorney for Somers has advised the attorney for Soglin that he intends to take the deposition of the chief. The attorney for Soglin intends to call the chief as a witness for Soglin in the lawsuits. Somers will also be a witness in the case.

## 3. *Swenson*

Defendant Commissioner Swenson and his wife have enjoyed a close social relationship for a substantial period of time with Roth Watson and his wife. Defendant Commissioner Swenson has stated to the chief that Roth Watson should be promoted within the department. At a meeting of the Board on November 14, 1973, when Watson was seated in the audience, defendant Commissioner Swenson appeared to look at Watson on three occasions when he was called upon to vote on questions affecting the chief's status and Watson appeared to be signaling by movements of his head what vote would be appropriate.

## C. *Facts as alleged with respect to plaintiff's "property" or "liberty" at stake in Board proceedings.*

On December 18, 1972, the then president of the Board submitted a letter to the plaintiff confirming a telephone conversation of December 16 in which the Board offered plaintiff an appointment as chief on the conditions:

That the appointment was subject to a probationary period of one year with the exclusive right of the Board to extend the probationary period for up to two consecutive six-month periods; and

That if at any time plaintiff should become aggrieved under the terms of the probationary period or possible extensions, due process would be accorded him and he would be entitled to a full public hearing before the Board, all in accordance with Wisconsin Statutes.

The written confirmation of the offer was accepted by the plaintiff.

On December 20, 1972, the Board ratified the December 16 announcement of the appointment, and it resolved that plaintiff's appointment as chief was subject to a probationary period of one year with the exclusive right of the Board to extend the probationary period for up to two consecutive six-month periods and that if at anytime plaintiff were to become aggrieved under the terms of the probationary period and possible extensions thereof, he would have the right to a full public hearing before the Board, all in accordance with Wisconsin Statutes 62.13 and due process of law.

Plaintiff's annual salary is $27,000.

The statement of charges against the plaintiff filed December 28 reflects upon his good name, his professional and public reputation, his honor and integrity. The statement of charges has been publicized.

## OPINION

### A. *The plaintiff's request that a three-judge court be convened.*

A three-judge court is to be convened under 28 U.S.C. § 2281 only when an injunction is sought "restraining the enforcement, operation or execution of any State statute by restraining the action of any officer of such State in the enforcement or execution of such statute . . . upon the ground of the unconstitutionality of such statute."

█ I understand the plaintiff to make two contentions. The first is that Section 62.13(5), Wis.Stat., is unconstitutional because it contemplates (subsection (j) ) that the Board may file charges against a chief of police and then proceed to hear and determine the validity of the charges. But there is no contention that the Board has filed against the plaintiff the charges of December 28 which are the subject of the proceedings presently pending before the Board. The second contention appears to be that Section 62.13(5), "on its face and as applied, . . . permits the Defendant Commission to initiate and conduct an extensive and sweeping investigation of the Plaintiff [presumably, the Mittelstadt investigation] with the knowledge that the fruits of said investigation will be the basis of charges against the Plaintiff [presumably the December 28 statement of charges] which the Defendant Commission will then sit in judgment upon." But Section 62.13(5) is silent on this point; it authorizes no such investigation as that conducted by Mittelstadt; whether, in the absence of any such statutory authorization, the Mittelstadt investigation was "permitted" is a serious question; however, the injunction sought in this present suit in this federal district court cannot fairly be considered an injunction restraining "the enforcement, operation, or execution" of any provision of Sec. 62.13(5).

There are no grounds for convening a three-judge court to consider this action.

The temporary restraining order sought here is that authorized by 28 U. S.C. § 2284(3) in a situation in which a three-judge court is to be convened. However, because the defendants, have been given an adequate opportunity to oppose the motion on grounds other than disputes of fact, it appears fair to consider the motion either as a motion for a temporary restraining order pursuant to Rule 65(b), or as a motion for a preliminary injunction pursuant to Rule 65(a), of the Federal Rules of Civil Procedure. However, it is to be emphasized that the defendants have not as yet been afforded the opportunity to dispute the factual allegations of the verified complaint or of the affidavits submitted by the plaintiff in support of the motion.

### B. *The plaintiff's motion for a temporary restraining order or a preliminary injunction*

Plaintiff has a good chance ultimately to prevail in his contention in this lawsuit that his liberty is at stake, within the meaning of the due process clause of the Fourteenth Amendment, in the current proceedings against him before the Board, based upon the December 28, 1973, statement of charges. Plaintiff also has a good chance to prevail in his contention that his property is also at stake, within the meaning of the due process clause of the Fourteenth Amendment; the Wisconsin Statutes do not appear to authorize an appointment of a chief of police on any basis other than tenure which can be terminated only for "cause"; moreover, the specific terms of the letter of employment and the appointing resolution appear to confer such tenure upon him; the word "probationary," whatever it may mean, does not appear to have withheld from the plaintiff a "property" interest in the position, within the meaning of the due process clause of the Fourteenth Amendment.[1]

---

1. Sec. 62.13 provides simply that the Board shall appoint the chief of police, "who shall hold [the office] during good behavior, subject to suspension or removal by the board for cause."

■■ It follows that plaintiff's employment as chief cannot be terminated by the Board, nor can it be suspended for any significant period, unless he has been provided with constitutionally minimal procedural due process.

It ·is clear that with respect to the pending proceedings before the Board based upon the December 28 statement of charges, the plaintiff has already been furnished with a copy of that statement, and that he is being provided an opportunity to be heard on those charges, with the assistance of counsel. Whether he will be provided every element of procedural due process which the Fourteenth Amendment requires in this context remains to be seen. However, reserving the question to be considered in the balance of this opinion, the plaintiff's showing that he is threatened with denial of procedural due process has been insufficient to support temporary or preliminary injunctive relief.

The question just reserved, and the central question presently to be decided, is whether the plaintiff is presently threatened with irreparable injury because the December 28 statement of charges is about to be heard and determined by a board which is so biased that the due process clause of the Fourteenth Amendment would be violated by any further proceeding in that forum.

■ As I indicated in my remarks from the bench on January 21, 1974, I should have thought that injunctive relief in such a situation is premature since, whatever the intuitive predictions of those involved in the dispute and of other observers may be, it is clearly possible that the Board may determine that each of the December 28 charges is false and that no sanction of any kind against the chief is indicated. The question is not whether the plaintiff in an action under 42 U.S.C. § 1983 is required to exhaust the judicial or non-judicial remedies available to him under state law; he is not so required. Rather, the question is whether he is threatened with irreparable injury with sufficient direct-ness and immediacy in a situation in which the hearings before the Board have scarcely begun. I should have thought it especially inappropriate to enjoin the proceedings at such an early stage when it appears, as it does in the present case, that under state law no forum other than the defendant Board is empowered to hear and to determine the merits of the statement of charges filed December 28, and to determine what sanctions, if any, are appropriate in the event that one or more of the charges are proved.

■ However, the unanimous decision of the Supreme Court of the United States in Gibson v. Berryhill, 411 U.S. 564, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973), is a clear holding that there can be circumstances in which the decision-making entity of the state (the state board of optometry, in *Gibson*) is so biased that a federal district court may properly enjoin any proceedings before such entity. Also, it appears from the report of the *Gibson* decision, although it is not explicit, that the injunction created a situation in which, under the laws of Alabama, no entity other than the board of optometry was authorized to hear and to determine the particular complaints in question. I conclude that I am required by the *Gibson* decision to inquire whether, under the particular facts of the present case, as alleged by the plaintiff, there is present in the defendant Board of Police and Fire Commissioners a bias so strong as to require that it be prevented from further proceedings based upon the December 28 statement of charges against the plaintiff.

In *Gibson*, the trial court and the Supreme Court agreed that the economic bias built in to the Alabama system of regulation of optometry was so powerful as to require an early injunction in order to vindicate the guarantees of the due process clause of the Fourteenth Amendment. The trial court also found that the evidence of prejudgment of the issues by the state board of optometry was so strong as to require an early in-

junction; the Supreme Court expressly declined to reach and to consider this source of bias, and confined itself to the matter of economic or pecuniary bias.

■ *Gibson* leaves me free to apply what I consider to be a proper constitutional standard, namely, that the showing of the existence of bias in the decision-making entity, such as the Board of Police and Fire Commissioners, must be extremely strong before the board is to be enjoined even from conducting hearings on charges which fall within its exclusive jurisdiction.[2] To adopt any less stringent test would be to introduce unnecessary and undesirable impediments to the supervision of a president of a public university by its governing board, to the supervision of a superintendent of a public school system by the board of education, to the supervision of the medical staff of a public hospital by the executive committee of the medical staff or by the board of directors of the hospital, and to the supervision of other public officials by the boards and commissions charged by law with the responsibility for such supervision.

It is suggested that such implications for other governmental entities need not infuse a decision in this particular case because under the applicable state law, the Board of Police and Fire Commissioners of the City of Madison does not exercise general supervision over the operations of the chief and of the police department. The suggestion has some merit. It is true that the relationship between the Madison Board and the chief of police differs from the relationship between a school board and a superintendent of schools. The school board and the superintendent must work together continuously and intimately in determining policies and practices to govern the operation of the schools.

The function of the Madison Board of Police and Fire Commissioners, on the other hand, is severely limited to the area of appointment, promotion, and discipline of police personnel. Section 62.-13, Wis.Stat. However, the "personnel" powers of the Board include the power to appoint, to suspend, and to remove the chief himself or herself. Also, with respect to the continuing process of recruitment, promotion, and discipline of police personnel other than the chief, it is necessary for the Board and the chief to develop and to pursue a continuing working relationship. Therefore, I conclude that a decision on the constitutional question in the present case inevitably contains significant implications for many other governmental relationships, including the examples I have mentioned above.

I undertake now to apply to plaintiff's allegations here the rather severe constitutional standard I have stated: that the showing of the existence of bias must be extremely strong in order to justify early injunctive relief.

The plaintiff's contention that defendant Somers must be disqualified because of his pecuniary interest in his pending defamation lawsuit against the mayor clearly falls far short of meeting the severe constitutional standard I have chosen to apply. In order to assess the contention fairly to the chief, one must assume that Somers is reasonably confident that he will benefit financially from his suit against the mayor. So far as appears from the record of the present case in this court, however, Somers v. Soglin turns principally upon whether Somers, while a member of the Board, undertook to urge upon the chief the promotion of one or more members of the department. It is conceivable that Somers and the chief may have dif-

---

2. By "exclusive jurisdiction," I do not mean to imply that every other agency, such as a mayor or a city council or an instrument established by a mayor or a city council, is excluded by state law from inquiring into the operations of the police department. I venture no comment on the law of the state in this respect. I intend to say, only, that it is the Board of Police and Fire Commissioners, and no other agency, which is empowered to hear and to determine the December 28 statement of charges filed with it, and it is only that Board which is empowered to apply sanctions against a chief.

fering recollections on that point, and that this discrepancy will come to light in the course of the Somers v. Soglin lawsuit. However, there is no reason to believe that that eventuality, if it does materialize, will arise prior to the completion of the Board's consideration of the December 28 statement of charges against the chief. The precise contention appears to be that defendant Somers will be moved to decide issues adversely to the chief in the pending proceedings before the Board in order to discredit subsequently the possibly adverse testimony of the chief in Somers v. Soglin, and thus to enhance the likelihood of financial gain to Somers in the latter lawsuit. The contrast is sharp between such a tenuous and speculative factor in this case, on the one hand, and the solid, built-in economic factors operative in the *Gibson* situation.

No pecuniary or financial bias appears to be alleged with respect to defendant Commissioners Liddicoat and Swenson.

With respect to both defendants Liddicoat and Swenson, the essence of plaintiff's contention appears to be that they are close friends of Roth Watson; that Watson is believed by some to have been persuasive with Liddicoat on the question whether plaintiff should have been appointed chief in December, 1972; that Watson is believed to exert influence on Swenson with respect to Swenson's votes as a commissioner; that Watson is ambitious for promotion within the department and has told the chief of his ambitions; that Liddicoat and Swenson have been supportive of Watson in his ambitions; and that Watson, Liddicoat, and Swenson are presently frustrated with respect to Watson's realization of his ambitions. As I have emphasized earlier in this opinion, solely for the purpose of testing the merits of plaintiff's motion, I am assuming the truth of these contentions.

I am called upon to decide what the due process clause of the Fourteenth Amendment requires in situations of this kind and in other comparable situations, year in and year out, perhaps decade in and decade out. I am not permitted to indulge in judgments as to what conduct on the part of police and fire commissioners in their relationships with departmental personnel may or may not be wise, circumspect, or discreet. There must surely be a range of conduct on the part of commissioners which is unwise, careless, and indiscreet, but which is not so gross as to compel an injunction, on constitutional grounds, barring them from performing the duties of their office. Assuming that the plaintiff could prove his allegations with respect to the social relationships between Commissioners Liddicoat and Swenson, on the one hand, and Roth Watson, on the other, this conduct might properly be assigned to the twilight zone I have described, as might their alleged conduct in urging upon the chief the promotion of Watson.

The allegations with respect to Watson's influence upon the votes of Commissioners Liddicoat and Swenson, if they could be proved, would be of more serious proportions.

However, with respect to Commissioner Liddicoat, the outer reaches of the plaintiff's allegations are that Watson and the wife of Commissioner Swenson share the opinion that it was Watson who persuaded Commissioner Liddicoat to vote for plaintiff's appointment as chief. I consider inadequate these allegations as to the opinions of Watson and Mrs. Swenson on the point. Assuming the truth of plaintiff's allegations, and adding the inference that Watson and Mrs. Swenson's assessment of the matter is correct, it would add up to an unseemly single instance in which a commissioner had allowed herself to be persuaded by a subordinate police officer with respect to the choice of an appointee to a higher departmental office. I do not regard this as constitutionally disqualifying.

With respect to Commissioner Swenson, the outer reaches of the plaintiff's allegations are that Watson engaged in an effort to communicate physically to

Commissioner Swenson, during a Board meeting, Watson's ideas as to how the Commissioner should vote, and that Commissioner Swenson strained to observe the signals. If plaintiff were able to prove these allegations, it would of course, constitute disgraceful conduct on the part of Watson, and if it should eventuate that Commissioner Swenson was aware of Watson's conduct and failed to rebuke him for it, then disgraceful conduct on the part of defendant Swenson as well. However, although the question would be close, I am not persuaded that proof of such conduct would be adequate to establish, to a constitutionally sufficient degree, that the Commissioner actually cast his votes on the basis of Watson's signals.

There remains to consider the plaintiff's contention that for reasons related to the Mittelstadt investigation and report, the entire Board is constitutionally disqualified from entertaining and acting upon the December 28 statement of charges.

I indicate first the matters which I am not called upon to decide. I am not called upon to determine whether under state law the Board was empowered to authorize the Mittelstadt investigation; nor to determine the adequacy of the procedures observed by Mittelstadt in the course of conducting his investigation; nor to determine whether Mittelstadt's interim or final reports were to be admired either in form or content; nor to decide when, if ever, the Board was required to reveal to the chief the names of the signers of the August 2 petition.

▓ Rather, I am called upon to determine whether, prior to December 28, the Board embarked upon a course of conduct with respect to the Mittelstadt investigation, which constitutionally prevents it now from acting upon the December 28 statement of charges because it has prejudged the issues raised by those charges. If the plaintiff's allegations with respect to the Mittelstadt investigation based on the August 2 petition were to be proved, it would be difficult to understand how a Board possessing so heavy and exclusive a responsibility, carefully prescribed by statute, with respect to the possible suspension or removal of a chief of police, would rather stubbornly persist in incurring so grave a risk of emasculating itself and leaving the public with no entity authorized by law to consider a subsequently filed statement of charges against the chief. The risk was indeed grave and, as I see it, the escape narrow. However, again speaking in constitutional terms, I cannot conclude that the receipt of the Mittelstadt reports by the Board, without more, disqualifies the Board from acting upon the December 28 statement of charges. And nothing more has been alleged. There is no showing that the Board endorsed or approved the Mittelstadt reports after they had been received.

## ORDER

Upon the basis of the entire record, it is hereby ordered:

1.  that the plaintiff's request that a three-judge court be convened is denied; and

2.  that plaintiff's motion for interlocutory injunctive relief, whether construed as a motion for a temporary restraining order or as a motion for a preliminary injunction, is denied.