BROWN, Circuit Judge,
concurring:
Patience may be a virtue but there’s nothing virtuous about the administrative delays the BIA has routinely forced recognition-seeking Indian tribes to endure. “At present day, a federal acknowledgment petition can be over 100,000 pages long and cost over $5 million to assemble; the BIA estimate time for completion of the review is 30 years.” See Harry S. Jackson III, Note, The Incomplete Loom: Exploring the Checkered Past and Present of American Indian Sovereignty, 64 Rutgeüs L. Rev. 471, 497 (2012). That means a case worker could start the review process her first day at BIA and retire with her full pension before ever completing it. That’s appalling.
The Part 83 process begins when a tribe’s governing body submits a letter of intent to the Assistant Secretary of the BIA. The agency then publishes the requisite public notices and begins an administrative file for the tribe—now considered a “petitioner.” At this point, it is incumbent on the petitioning tribe “to provide enough historical documentation to satisfy the seven criteria established by [Part 83] to determine if the tribe is a ‘political and social community that is descended from a historical tribe.’ ” Id. Answering this question is admittedly a nuanced and time-consuming process, requiring agency expertise. By the end, the administrative record tends to range “in excess of 30,000 pages to over 100,000 pages.” Barbara N. Coen, Tribal Status Decision Making: A Federal Perspective on Acknowledgment, 37 New Eng. L. Rev. 491,495 (2003).
Mindful of the intensity of this task— and the agency’s unique capacity for completing it—I agree that exhaustion should be required here, but I do so hesitantly. I believe we would be remiss to treat this as a run-of-the-mill case of administrative exhaustion. Exhaustion might reasonably take months—maybe years—but certainly not generations. For instance, the resolution of an IRS appeal may take “anywhere *759 from 90 days to a year” depending on facts and circumstances. What You Can Expect From Appeals?, IRS (May 23, 2016), https://www.irs.gov/individuals/what-can-you-expect-from-appeals. An individual appealing the termination of her disability benefits can expect that appeal to be decided “in as little as four weeks or as long as twelve weeks.” How Long Does A Social Security Disability or SSI Appeal Take?, Soc. Seo. Disability Res. Ctr., http:// www.ssdrc.com/disabilityquestions2-46. html (last viewed July 8, 2016). And in 2015, it took the EEOC, on average, “10 months to investigate a charge.” What You Can Expect After You File A Charge, Equal Emp. Opp. Comm, (last viewed July 8, 2016), https://www.eeoc.gov/employees /process.cfm. Compare this with the Cowl-itz Tribe of Washington’s experience with the acknowledgment process: the tribe first petitioned the government for recognition in 1975 and only received it in 2000—twenty five years later. See Sarah Washburn, Note, Distinguishing Carcieri v. Salazar: Why the Supreme Court Got It Wrong and How Congress and Courts Should Respond to Preserve Tribal and Federal Interests in the IRA’s Trust-Land Provisions, 85 Wash. L. Rev. 603, 629 (2010). Requiring exhaustion in this context asks far more of tribes like the Mackinac than it does in our usual administrative cases.[2]
The acknowledgement process also requires tribes to sacrifice more than just time. “Volumes of documentary support are required of petitioners chronicling the genealogy, ethno-history, and political life of the group seeking recognition.” Gerald Carr, Origins and Development of the Mandatory Criteria Within the Federal Acknowledgment Process, 14 Rutgehs Race & L. Rev. 1 (2013). Indeed, “[t]he creation of the documents alone has been estimated to take between two-and-a-half and five years.” Alva C. Mather, Comment, Old Promises: The Judiciary and the Fu *760 ture of Native American Federal Ac-knmvledgment Litigation, 151 U. Pa. L. Rev. 1827, 1840 (2003). The burden falls to the tribe to “hire an array of experts: anthropologists to validate the existence of a current tribal community, genealogists to trace tribal ancestry, and lawyers to oversee the process.” Id, “On average, tribes have paid between $300,000 and $500,000 for the creation of their petition” and some have paid “more than a million dollars for their documentation.” Id.
Beyond tangible investments like time and money, the process is also emotionally draining. To be acknowledged, tribes must reveal “their members’ personal stories and the community’s history to a federal agency,” with that information then becoming part of the public record. Id. at 1141. For some tribes, “disclosing information about their community life violates their traditions and results in considerable emotional loss when this information is revealed to individuals outside the tribe.” Id. And the passage of time can ultimately preclude a tribe from obtaining necessary documentation, particularly when important tribal leaders “who may have been able to provide necessary first-hand information to federal investigators” die while the tribe’s petition is pending. Id.
One would hope, given the significant amount of resources required to navigate this bureaucratic morass, that the process itself would at least be sound. But the process has been criticized—including by a Government Accounting Office report—for its “lack of transparency,” for the regulations’ “vague[ness],” and for the “improp-ere ] influence” that gaming concerns exert on the agency. Roberto Iraola, The Administrative Tribal Recognition Process and the Courts, 38 AkRon L. Rev. 867, 892-83 (2005). What’s more, it seems the vast majority of tribes that were already federally acknowledged would be unable to meet the current Part 83 standards. See Jackson, supra, at 507 (noting that, in 2010, the BIA recognized “72% ... of currently recognized federal tribes could not successfully go through the [Part 83] process as it is being administered today”).
Despite my significant concerns about both the length and the integrity of this process, I agree that the Mackinac Tribe must at least try to exhaust its administrative remedies in this context—which is far outside the judiciary’s wheelhouse. Still, we are reminded today that Justice Douglas’s words ring as true now as they did nearly half a century ago: “The bureaucracy of modern government ... is slow, lumbering, and oppressive.” Wyman v. James, 400 U.S. 309, 335, 91 S.Ct. 381, 27 L.Ed.2d 408 (1971) (Douglas, J., dissenting).

. It is worth mentioning that "exhaustion is not required when unreasonable administrative delay would render the administrative remedy inadequate.” Sw. Bell Tel. Co. v. FCC, 138 F.3d 746, 750 (8th Cir. 1998); see also Gibson v. Berryhill, 411 U.S. 564, 575 n. 14, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973) (nothing that when administrative remedies are deemed inadequate it is “[m]ost often ,.. because of delay by the agency”); Smith v. Illinois Bell Tel. Co., 270 U.S. 587, 591-92, 46 S.Ct. 408, 70 L.Ed. 747 (1926) (holding a petitioner "is not required indefinitely to await a decision of the rate-maldng tribunal before applying to a federal court for equitable relief”). Tribes languishing in the Part 83 process have occasionally sought relief under this "unreasonable delay" doctrine. For instance, in Muwekma Tribe v. Babbitt, the district court granted mandamus relief to the Muwekma Tribe—which entered into the Part 83 process in 1989 and had yet to receive a determination as of 2000. 133 F.Supp.2d 30, 32-33 (D.D.C. 2000). In doing so, the court analyzed the factors we laid out for assessing unreasonable delay in TRAC v. FCC, 750 F.2d 70 (D.C. Cir. 1984), and concluded that factors like the decision’s slow pace and the nature and extent of the interests prejudiced warranted relief. See Muwekma Tribe, 133 F.Supp.2d at 36-41, It may seem, then, that the Mackinac Tribe could avail itself of this judicial remedy once it enters into the Part 83 process, assuming it experiences a similar delay. However, a more recent case from our circuit calls even that potential avenue for relief into question. In Mashpee Wampanoag Tribal Council, Inc. v. Norton, we emphasized that Part 83 delays were "attributable, at least for the most part, to a shortage of resources addressed to an extremely complex and labor-intensive task.” 336 F,3d 1094, 1100 (D.C. Cir. 2003). We therefore remanded to the district court to consider whether such "competing priorities” rendered the delay reasonable in context, specifically whether the tribe was being treated differently than others and whether the agency was working on the matter. See id. at 1101-02. As the Mashpee court noted, a "problem stemming] from a lack of resources” is “a problem for the political branches to work out.” Id. at 1101. Unfortunately for the Mackinac Tribe, Congress has yet to heed this call.