**SMALL COAL OPERATORS ASSOCIATION, INC., Plaintiff,**

v.

**DISTRICT 28, UNITED MINE WORKERS OF AMERICA, Defendant.**

Civ. A. No. 83–0336–A.

United States District Court,
W.D. Virginia,
Abingdon Division.

Nov. 30, 1983.

Timothy McAfee, Norton, Va., for plaintiff.

Gerald Sharp, Castlewood, Va., for defendant.

## MEMORANDUM OPINION

GLEN M. WILLIAMS, District Judge.

Small Coal Operators Association, Inc. (hereinafter SCOA) is a Virginia corporation representing ninety-three coal operators in Southwest Virginia who employ persons represented by the United Mine Workers of America (hereinafter, UMWA). District 28, UMWA (hereinafter, District 28) not only is an unincorporated association and a labor organization, but also is an intermediate division of the International Union created by and through Article 9 of the UMWA constitution. District 28 and the other districts of the UMWA are given certain specific powers and duties under the labor agreement entered into with the Bituminous Coal Operators of America (hereinafter, BCOA) and, in addition, have certain powers and duties under their own constitution and the constitution of the International Union. This suit is brought pursuant to the Labor Management Relations Act of 1947 Section 301(a), 29 U.S.C. § 185(a).

On July 21, 1983, District 28 entered into a written agreement with SCOA, marked as "Plaintiff's Exhibit # 1," which directed the appointment of a District panel composed of seven arbitrators to hear all disputes between the members of District 28 and SCOA. Article XXIII, Section (b) Paragraph (2) of the National Bituminous Coal Wage Agreement of 1981 authorizes the establishment of the arbitration panel. The agreement also provides that at any time the parties, by mutual consent, may remove the panel of arbitrators by selecting a new panel either in part or in full.

Subsequent to their contract, District 28 and SCOA mailed a copy of their agreement to UMWA and BCOA, stating that the agreement was sent to them "for your information." It is important to note at this time that the letter signed by the District 28 President, John Kennedy, and the SCOA Vice-President, Jack Head, did not ask that the UMWA and BCOA concur with their agreement: It only stated that the panel of arbitrators had been selected and that it was a "co-District arbitration panel, as permitted under Paragraph (2), § (b) of Article XXIII of the National Bituminous Coal Wage Agreement of 1981." In this suit, District 28 contends, *inter alia*, that the agreement required the approval of the International Union and that a copy was sent for that approval rather than "for information." The ink was hardly dry on the agreement when a dispute arose.

Indeed, on July 22, 1983, one day after the signing of the agreement, Cecil Stokes, an arbitrator who was not selected as one of the seven-member panel pursuant to that agreement, came to hear a dispute between Johnny Sheckler, a member of District 28, and Big Ten Corporation, a member of SCOA. The record shows without question that Arbitrator Stokes had been appointed to hear this dispute before the parties entered into their agreement on July 21, 1983; otherwise, he could not have been on the ground on July 22, 1983. SCOA objected to Stokes' conducting the arbitration; District 28, on the other hand, insisted that Stokes proceed with the hearing.

Furthermore, District 28 immediately began inquiries to determine whether the parties were bound by the agreement of July 21, 1983. The Defendant's Exhibit # 2 shows that the District 28 President, John Kennedy, wrote a letter to the International Union on July 22, 1983 in which he asked whether the agreement was binding. The manager of the UMWA Contract Department, Bob Benedict, sent a letter dated August 4, 1983, received by District 28 on August 8, 1983. He relied upon Article XXIII, Section (b)(1), of the Agreement which provides that the International Union and the President of BCOA jointly shall establish the panel of impartial arbitrators if the employer and employee have not selected a panel within ninety days after the agreement goes into effect. Thus, the opinion of the International Union was that the parties had not complied with the ninety-day clause of Section (b)(2) and that District 28 and SCOA had no authority to have

entered into the agreement on July 21, 1983.

Meanwhile on August 2, SCOA filed this suit in which it requested a temporary restraining order to enjoin the arbitrational proceedings of Arbitrator Stokes and for other general relief. The court interprets the prayer of this suit as seeking enforcement of the contract of July 21, 1983. This court denied the temporary restraining order; Arbitrator Stokes held the hearing as scheduled on August 5, 1983; and on August 12, 1983, Arbitrator Stokes rendered an opinion favorable to District 28. This arbitrational opinion is the subject of a suit by District 28 against the Big Ten Corporation (U.S.D.C., W.D.Va., Civil Action No. 83–0414–A), which this court decides in a separate opinion.

District 28 contends: (1) that the court does not have jurisdiction of this suit because Section 301(a) of the Labor Management Relations Act grants jurisdiction over disputes between employers and employees and SCOA is not an employer and is not signatory to the contract; (2) that the agreement is void because the International Union has not ratified the agreement of July 21, 1983, (3) that SCOA and its represented companies are bound by custom and usage, or by what generally is known as the "common law of the shop," in that the selection of arbitrators for the small coal companies customarily has been taken from the panel chosen by District 28 and Clinchfield, Westmoreland and other large coal companies in the area (the so-called "Clinchfield Panel"). Since Arbitrator Stokes was a member of this Clinchfield Panel, he had the authority to conduct the Sheckler arbitration; (4) that the agreement of July 21, 1983 was not binding because under Article XXVI(d), the International Union must approve of district agreements and contracts before they become effective and it has not done so in the instant case; and (5) that the issue concerning the propriety of this panel is in itself an arbitrational matter and, hence, arbitrators themselves should determine whether they are entitled to sit on a particular case. Therefore, Arbitrator Stokes had the authority as an arbitrator to decide whether he was the proper arbitrator of the Sheckler case.

■ Article XXIII addresses the issues of the court's jurisdiction over this suit and SCOA's standing to bring this suit. Specifically, it provides that representatives may act for an employer. Employers, therefore, may form groups to act for them just as the Districts of the Union act for their members. The contractual provision dealing with arbitrators, Section (b)(2) of the Article XXIII states in part as follows: "In such event, representatives of the Employer and the UMWA District in which the Employer operates shall ... select an impartial arbitrator or panel of impartial arbitrators ...." The court is of the opinion that since the contract itself envisions representatives of the employers acting for them, SCOA was a proper party to enter into an agreement with District 28 and is a proper party to bring this suit.

District 28 contends in its second argument that ninety days had elapsed since the parties entered into their contract on June 6, 1981, and that District 28 and SCOA had not selected an arbitrational panel. As a result, therefore, no provision existed by which the parties could enter into an agreement. Article XXIII(b)(1), they contend, is the only authority by which the parties might establish a panel. More specifically, the President of the International Union and the President of BCOA would have to select the panel. The undisputed evidence in this case, together with a fair reading of the contract, produce a contrary result for several reasons.

First, all the parties in this case concede in testimony that historically BCOA and the International Union have never appointed arbitrational panels, nor have they ever approved of a panel selected locally. The parties have always designated panels at the district level in accordance with Article XXIII(b)(2), then informed BCOA and the International Union of their decision, just as they did when they entered into the agreement on July 21, 1983.

Second, the undisputed testimony is that under past procedures, the small coal companies have adopted and used the panel of arbitrators selected by Clinchfield Coal Company, Westmoreland Coal Company, and possibly other larger operators (the Clinchfield Panel); yet, they have entered into other panels with other companies when requested.

Third, the uncontested testimony is that after the adoption of the Agreement of 1981 and within the required ninety-day period, the Clinchfield-Westmoreland group selected a panel of arbitrators. According to custom, this panel then became the panel for those companies represented by SCOA.

■ Fourth, the important language in Article XXIII(b)(2), however, is as follows: "This panel may be changed or supplemented by mutual consent of the appointed parties. The arbitrator or arbitrators so selected shall serve for such term as agreed upon by the appointing parties." The undisputed testimony shows that the Clinchfield-Westmoreland group exercised their right to change the panel for District 28 and the Clinchfield-Westmoreland group agreed upon a new panel. SCOA, dissatisfied with the Clinchfield panel, exercised its right to request a new panel and District 28 agreed. Thus, the agreement of July 21, 1983 was in accordance with the language of Article XXIII(b)(2) which specifically provides that the parties can change the panel by mutual consent. Since the parties have changed the panel by mutual assent, they are bound fully by their agreement.

■ District 28's argument that Article XXVI(d) is a limitation of Article XXIII is misplaced. The pertinent portion of Article XXVI states as follows: "No District contract or agreement negotiated hereunder shall become effective until approval of such contract or agreement by the International Union, United Mine Workers of America, has been first obtained." This provisional restriction on District contracts is at the end of Article XXVI which is entitled "District Agreements" and deals with the kind of District agreements to which Section (d) has reference. On the other hand, Article XXIII deals exclusively with the settlement of disputes. It contains the only language in the contract dealing with arbitration and must be exclusively binding over every other part of the contract on the subject of arbitration.

If Article XXVI is construed in the manner asserted by District 28 in this suit, then it would permit the Union to take away the specific clause of the contract dealing with the settlement of disputes. The parties to the contract did not intend to give a district the contractual power to make agreements with an employer in arbitration matters and then in another clause take that power away. Obviously, the district agreements referred to in Section (d) of Article XXVI are the same agreements mentioned in Sections (b) and (c) of Article XXVI. Section (b), for example, provides as follows: *"[A]nd all local agreements*, rules, regulations and customs heretofore established in conflict with this Agreement are hereby abolished. Except where abolished by mutual agreement of the parties, all prior practice and custom not in conflict with this Agreement shall be continued ...." (Emphasis added). Thus, the court's interpretation of Section (d) of Article XXVI is that the districts can have separate agreements with companies in matters other than arbitration so long as these agreements do not conflict with other provisions of the contract and are approved by the International Union. If the parties had intended for Article XXVI to limit Article XXIII, they should have so stated in one or the other of these articles.

The Union's contention that the parties should have submitted the question of the validity of the contract to arbitration is not sound. In other words, this court is of the opinion that the parties already have determined the issue involved in the Union's contention by means of collective bargaining. Thus, the resolution of the issue is found in collective bargaining rather than in arbitration.

Article XXVII of the BCOA–UMWA contract states that the parties should determine matters through arbitration "unless

national in character in which event the parties shall settle such disputes by free collective bargaining as heretofore provided in the industry . . . ." The parties have decided the manner of selecting arbitrators in the collective bargaining process; therefore, the courts must enforce this provision because it goes to the heart of the integrity of the arbitrators themselves.

 If the selection of arbitrators is viewed as a matter for arbitration rather than for collective bargaining, then at least a serious problem is evident by such an approach. If an arbitrator, for example, must decide whether he is to sit on an arbitrational panel (which the Union proposes in its contention), then he has a very serious conflict of interest. The arbitrator has a financial stake in the outcome of the decision: He is a party to the dispute. Can a party to a controversy sit as a judge to determine whether he has a job or not? Obviously not. In other words, when a judge has a financial stake—even a minor interest, such as a stockholder,—in the outcome of that decision, he is disqualified to participate in the decisionmaking process. Otherwise, he deprives the parties of due process of law. Thus, when an arbitrator of a Clinchfield Panel sits in judgment of an agreement to select a panel for District 28–SCOA, he has a financial interest in the outcome of that decision: He cannot qualify as a decisionmaker.[1]

Accordingly, this court concludes that the agreement of the parties to this suit entered on July 21, 1983, is a valid agreement. An Order will be entered directing the parties to select arbitrators from the panel to which they agreed in the contract. As to arbitrations held since July 21, 1983 to this date, the court will rule on their validity on a case-by-case basis; however, unless the parties made a specific objection to the arbitrator at the time of the arbitrational hearing, the court will consider the objection as waived and the arbitration valid.

The Clerk is directed to send certified copies of this Memorandum Opinion to all counsel of record.

---

1. It is well settled that "a fair trial in a trial tribunal is a basic requirement of due process." *In re Murchison*, 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955). An essential element of a fair hearing is an impartial decisionmaker. *Goldberg v. Kelly*, 397 U.S. 254, 271, 90 S.Ct. 1011, 1022, 25 L.Ed.2d 287 (1970). *See Mathews v. Eldridge*, 424 U.S. 319, 332–335, 96 S.Ct. 893, 901, 47 L.Ed.2d 18 (1976); *Cain v. Commonwealth of Virginia*, 574 F.Supp. 559 (W.D.Va. 1983) (Civ. Action No. 82–0334–A).

 One who stands to gain or lose personally by a decision either way is disqualified by reason of interest to participate in the exercise of judicial functions. A disqualifying interest may be pecuniary or may involve the imbalance that is assumed to persist in one who has played the role of advocate in the same case. . . .

 3 K. Davis, *Administrative Law Treatise* § 19.6 at 392 (2d at 1980). The Supreme Court has held that those judges with a substantial pecuniary interest in legal proceedings should not determine such disputes. *Arnett v. Kennedy*, 416 U.S. 134, 197, 94 S.Ct. 1633, 1665, 40 L.Ed.2d 15 (1974) (White, J., concurring in part and dissenting in part); *Ward v. Village of Monroeville*, 409 U.S. 57, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972); *Tumey v. Ohio*, 273 U.S. 510, 532, 47 S.Ct. 437, 444, 71 L.Ed. 749 (1927). The facts of both the *Ward* and *Tumey* cases involved local mayors who sat as judges for trials of petty offenses. To determine the impartiality of these officials, the Court adopted the test of whether the mayor's situation is one "which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which would lead him not to hold the balance nice, clear and true between the State and the accused . . . ." *Tumey*, 273 U.S. at 532, 47 S.Ct. at 444, *quoted in Ward*, 409 U.S. at 60, 93 S.Ct. at 83. The Court in *Ward* reaffirmed the decision of *Tumey*, holding that the judge was disqualified "both because of his direct pecuniary interest in the outcome, and because of his official motive to convict and to graduate the fine to help the financial needs of the village." 273 U.S. at 535, 47 S.Ct. at 445. "Petitioner is entitled to a neutral and detached judge." *Ward*, 409 U.S. at 61–62, 93 S.Ct. at 83–84.

 It appears that this concept applies to arbitrators as well as judicial trials and administrative hearings. *See Gibson v. Berryhill*, 411 U.S. 564, 579, 93 S.Ct. 1689, 1698, 36 L.Ed.2d 488 (1973). Thus, an arbitrator who has a financial stake in the outcome of the hearing certainly cannot be an impartial decisionmaker.