**B.A.M. BROKERAGE CORP., Amy Litsky, et al., Plaintiffs,**

v.

**The STATE OF NEW YORK, James P. Corcoran, et al., Defendants.**

**No. 88 Civ. 5714 (RWS).**

United States District Court, S.D. New York.

Aug. 4, 1989.

Weg and Myers, P.C., New York City (Dennis T. D'Antonio, David B. Karel, of counsel), for plaintiffs.

Robert Abrams, Atty. Gen. of the State of N.Y., New York City (Frederic L. Lieber-

man, August L. Fietkau, Asst. Attys. Gen., of counsel), for defendants.

## OPINION

SWEET, District Judge.

Defendant State of New York (the "State") and defendants James P. Corcoran ("Corcoran"), Martin Minkowitz ("Minkowitz"), Nathan Silver ("Silver"), Salvatore Castiglione ("Castiglione"), Alan Di Piazza ("Di Piazza"), Arthur Goldfeder ("Goldfeder"), and other unnamed individuals (collectively, the "Individual Defendants") move pursuant to Rule 56, Fed.R.Civ.P., for summary judgment dismissing the complaint as to all defendants and pursuant to Rule 4(j), Fed.R.Civ.P., for an order dismissing the complaint as to the Individual Defendants for failure to serve a summons and complaint. For the reasons set forth below, summary judgment is granted, and the complaint is dismissed in its entirety.

### The Parties

During the period at issue, Corcoran was the Superintendent of Insurance for the State (the "Superintendent"), Minkowitz headed the Office of General Counsel ("Counsel") for the New York Insurance Department (the "Department"), Silver was Chief of the Consumer Services Bureau (the "Bureau"), Castiglione was the Bureau's Principal Insurance Examiner, and Di Piazza was a Senior Examiner with the Bureau. Minkowitz and Silver since have left the Department.

Plaintiffs B.A.M. Brokerage Corporation and some one hundred other individuals and corporations (collectively, the "Brokers") are licensed to sell insurance in New York by the Department.

American Motor Club, Inc. ("AMC") is a New York corporation that marketed automobile repair agreements (the "Repair Agreements") to the public through a network of insurance agents licensed by the Department (the "Licensees"), including the Brokers. Pursuant to those agreements, AMC promised to reimburse subscribers for the cost of repairing damaged automobiles or replacing vehicles lost to fire or theft. AMC operated as an alternative to the New York Automobile Insurance Plan—also know as the "Assigned Risk Pool"—which provided automobile insurance to higher risk drivers. AMC presently is in bankruptcy.

Along with hundreds of other Licensees, the Brokers sold Repair Agreements to the public in New York. According to the Brokers, a number of Licensees asked the Department whether they could sell the Repair Agreements, and the Department either said the Repair Agreements were not insurance or declined to say whether or not the agreements were lawful.

### Prior Proceedings

Following an investigation of AMC, the State Attorney General and the Superintendent sued AMC in October 1985 in the Supreme Court, State of New York, County of New York, alleging that the Repair Agreements constituted "insurance," N.Y. Ins.Law § 1101 (McKinney 1985), and that AMC was engaged in the unauthorized sale of insurance. *Id.* at § 1102. On January 14, 1987, the Honorable Milton H. Richardson ruled that the Repair Agreements were insurance and enjoined AMC from marketing the Repair Agreements in New York (the "AMC Suit"). *See People v. American Motor Club, Inc.*, No. 85–43148, slip op. (N.Y.Sup.Ct. Jan. 14, 1987), *aff'd*, 133 A.D.2d 593, 520 N.Y.S.2d 383 (1st Dep't 1987).

After Justice Richardson issued his ruling in the AMC Suit, Nicholas Neu, AMC's President ("Neu"), began operating similar prepaid collision service companies in California. In June 1987, Corcoran and James Randolph, Deputy Superintendent of the Department, allegedly made defamatory remarks about Neu at an insurance commissioners convention in Chicago. Neu sued Corcoran and Randolph under 42 U.S.C. § 1983, alleging that the defendants' purported defamation had deprived him of a liberty interest, and under state defamation law. The defendants moved to dismiss, claiming official immunity under federal and state law, but the court denied the motion. *See Neu v. Corcoran*, 695 F.Supp. 1552 (S.D.N.Y.1988). The Court of Appeals reversed, holding that Corcoran and Ran-

dolph enjoyed official immunity. *See Neu v. Corcoran*, 869 F.2d 662 (2d Cir.1989), *petition for cert. filed*, June 1, 1989.

While the AMC Suit was pending, the Department also began investigating individual licensees. In response, the Brokers sued the Defendants under 42 U.S.C. § 1983 to enjoin the Department's allegedly predetermined disciplinary proceedings. *See B.A.M. Brokerage Corp. v. State of New York*, No. 87 Civ. 2287 (S.D. N.Y.) (RWS). Finding that the Department in fact had yet to take disciplinary action against any of the Brokers, the court dismissed the suit with leave to renew should the State commence disciplinary proceedings.

When the Department began Hearings against the Brokers, the Brokers brought this action under 42 U.S.C. § 1983 on August 15, 1988. The complaint alleges that "the defendants have decided and predetermined that the plaintiffs had violated the Insurance Law by the sale of AMC memberships," Complaint ¶ 23, in violation of the Due Process and Equal Protection clauses of the Fifth and the Fourteenth Amendments to the United States Constitution. The Brokers served the summons and complaint upon the State and Corcoran, but not upon any of the Individual Defendants.

On August 16, 1988, the Brokers moved by order to show cause for a preliminary injunction enjoining the Defendants from issuing citations and conducting Hearings against the Brokers. On September 1, 1988, the Defendants moved by order to show cause to dismiss the complaint, alleging that the court should abstain from interfering in a pending state administrative proceeding. An opinion dated November 22, 1988 denied both motions. *See B.A.M. Brokerage Corp. v. State of New York*, 700 F.Supp. 182 (S.D.N.Y.1988). Familiarity with that opinion is assumed.

In mid-March 1989, the Brokers moved for an order extending the time to conduct discovery and enlarging the scope of discovery. In an oral opinion issued February 10, 1989, the court granted the Brokers further discovery on the narrow issue of whether the Department was conducting the disciplinary hearings for an improper purpose that amounted to prejudgment in violation of due process. Toward this end, the court ordered depositions of Randolph, Altruda, Di Piazza, and Castiglione. In lieu of a deposition, the court required Corcoran to respond to interrogatories regarding his role in and knowledge of the Department's proceedings against the Brokers. It also directed the Department to provide the Brokers its AMC and Brokers investigative files.

On April 13, 1989, the defendants moved pursuant to Rule 56, Fed.R.Civ.P., for summary judgment dismissing the complaint as to all defendants and pursuant to Rule 4(j), Fed.R.Civ.P., for an order dismissing the complaint as to the Individual Defendants for failure to serve a summons and complaint. Oral argument was heard, and the case was considered fully submitted on May 26, 1989.

*The Facts*

When AMC failed to honor the Repair Agreements, consumers complained to the Department and to the Attorney General's office, claiming to have lost thousands of dollars. The Bureau therefore began investigating the Licensees who had sold the Repair Agreements to the public. Under New York law, it is unlawful for any "person, firm, association or corporation" to "in any way or manner aid" an unauthorized insurer to sell insurance in New York. N.Y.Ins.Law § 2117 (McKinney 1985). Any person who violates section 2117 is subject to a $500 per month forfeiture, *id.* at § 2117(g), and a Licensee who violates the Insurance Law is subject to license suspension, revocation and/or civil penalty. *See id.* at §§ 109, 2110.

During the investigation, the Bureau sent a letter to certain Licensees requiring them to appear before a Bureau investigator to give evidence. This was an investigative appearance, not an adjudicatory hearing. According to the Brokers, the Department determined which Licensees to approach based upon several factors, including 1) whether the Licensee had written a substantial volume of business in the

**1198**

assigned risk pool, 2) whether consumers had filed a substantial number of complaints against the Licensee concerning the Repair Agreements, and 3) whether the Licensee was listed in the Yellow Pages.

Pursuant to standard practice and at Minkowitz's request, Paul F. Altruda, Assistant Deputy Superintendent and Counsel of the Department ("Altruda"), drafted a stipulation of settlement (the "Stipulation") for Licensees to execute in exchange for the Department ceasing further disciplinary proceedings. Altruda consulted with Minkowitz on this matter, but did not discuss the Stipulation with Corcoran.

Early in the investigation, the late Ira Myers ("Myers") of the law firm of Weg and Myers, P.C., which represented a number of Licensees, requested a meeting with the Department to discuss what action, if any, the Department might take against the Licensees. Pursuant to that request, several Department employees—including Randolph, Altruda, J. Mansfield, a Bureau investigator ("Mansfield"), J. Dickler, also a Bureau investigator ("Dickler"), Di Piazza, Castiglione, and S. Wachtel, a Counsel attorney ("Wachtel")—met with Myers on April 1, 1987 (the "April 1 Meeting").

According to Di Piazza's notes, Altruda's affidavit, Myers's affirmation, and the deposition testimony of Altruda, Castiglione, and Di Piazza, the following occurred at the April 1 Meeting:

1) Myers, Altruda, and Randolph discussed what steps the Licensees and the Department could take to replace coverage under the Repair Agreements.

2) Myers sought information about "hearings" scheduled by letters sent to the Licensees. Altruda informed Myers that the letters related to "conferences," not hearings. Castiglione stated that the conferences were scheduled five per hour with an investigator seeing each Licensee alone.

3) Altruda said that the Department planned to discipline Licensees for "placing business with unauthorized insurers for theft coverage" and "[a]iding and abetting unauthorized in-surers not license[d] to do business in the State of New York," not for doing business with AMC. When Myers said the Licensees were selling service contracts, not insurance, Altruda stated that the Repair Agreement's theft provision constituted "pure insurance."

4) Responding to Myers's complaint that the Department failed to give the Licensees notice of the alleged insurance law violations, Castiglione stated that the litigation pending in state and federal court provided notice. Altruda explained the litigation.

5) Myers inquired about whether the Department could order Licensees to repair vehicles under AMC contracts. Altruda responded that restitution remained an issue.

6) Altruda and Castiglione indicated that the Department might charge some Licensees with "misrepresentation" for using insurance terminology and forms when selling the Repair Agreements, thereby misleading the public that the transactions involved licensed insurance products.

7) Myers inquired about the terms of a stipulation for Licensees who concede that they placed insurance with unauthorized insurers. Castiglione stated that the fine would amount to "[$]100[.] per line for those licensees that sold the product and cooperated with the Department—$200 per line with those who failed to cooperate with the [Department's] investigation." Later, Myers asked whether the Department would consider "fines of flat amounts taking into consideration mitigation." Altruda responded that the "Department will consider mitigation. If brokers paid AMC losses before the date of the conference [the Department] would consider this as mitigation in some manner to be determined at a future date."

8) Responding to Myers's inquiry regarding the fate of Licensees who sold large numbers of Repair Agreements, Altruda said "we have told you what penalties the Department is consider-

ing at this time." When Myers stated that the fines could put some Licensees out of business, Altruda said the Licensees should have known the risks. Di Piazza added that Licensees are considered experts in the insurance area.

9) Myers asked whether the Department would accept fine payments on a scheduled basis payable in monthly installments. Altruda answered that this was "double" and that he would provide Myers an answer in the near future.

10) Myers expressed concern that the Stipulations might expose the Licensees to lawsuits by consumers who purchased Repair Agreements. Altruda stated: "It is standard Department procedure to require a licensee [to] sign a Stipulation when disciplined. It so states that his violation can be used against him in the future. This will be followed in this case as it always has been." Altruda then suggested that Myers think further about the restitution question.

11) Myers asked whether the Department would allow a group of Licensees to act as receivers to fund outstanding claims. Altruda said this was unacceptable because it presented a conflict of interest.

12) Noting that the Licensees offered the Repair Agreements "as a service to the public," not to make money, Myers complained that the fines were excessive. Castiglione responded that the Department estimated that Licensees made a $100 to $300 commission for each Repair Agreement. Di Piazza added that the fines represented "only a small part of the commission received by licensees."

Di Piazza's handwritten notes from the April 1 Meeting attributed the following statement to Randolph: "Punishment—Firing Squad." According to Myers's affirmation, Department representatives stated at the April 1 Meeting that Licensees who sold Repair Agreements were "crooks" who deserved to lose their licenses. Myers's affirmation also indicates that the Department had determined to cite Licensees for revocation of their licenses if they failed to attend the investigative conferences.

Following the April 1 Meeting, Altruda consulted with Minkowitz, Castiglione, Di Piazza, and perhaps others in the Department—but not Corcoran—regarding the Stipulation's terms. In its final form, the Stipulation included 1) an acknowledgement that the Licensee had violated § 2117 of the New York Insurance Law, but not willfully or intentionally and 2) an agreement (a) to pay a penalty of $100 for each Repair Agreement sold or (b) to pay a fine ranging from $250 to $2,500 (depending upon the number of Repair Agreements sold) and to make restitution available to any consumer who purchased a Repair Agreement from that Licensee and who had an outstanding claim under that agreement. The Stipulation contained no requirement that a Licensee's license be suspended or revoked. To date, approximately 800 Licensees—including some of the Brokers—have signed the Stipulation.

If Licensees declined to sign the Stipulation, the Bureau recommended that Counsel institute formal disciplinary hearings (the "Hearings"). Castiglione testified that "[n]ormally [he] would request the blue cards before a Hearing is held." He explained that:

A blue card is, I guess, a slang term where an examiner would notify the Licensing Bureau of the Insurance Department that no new licenses should be issued to a particular entity or individual pending the outcome of an investigation that is currently going on.

If Counsel believed a hearing was appropriate, it issued citations requiring the Licensees to show cause at a Hearing before a hearing officer (the "Hearing Officers") why the Department should not impose disciplinary action. The Superintendent appointed Hearing Officers from among Counsel's senior attorneys.

Hearing Officers were not Bureau employees. Moreover, under New York Insurance Regulations, the Superintendent

could not appoint as a Hearing Officer an attorney who had "previously dealt in a substantial way with the substance of the matter which is the subject of the adjudicatory proceeding, or who ha[d] an existing or potential conflict of interest...." N.Y. Comp.Codes R. & R. tit. 11, § 4.2(b). None of the Individual Defendants served as a Hearing Officer in proceedings against the Licensees.

The Department's hearing procedure, N.Y.Comp.Codes R. & R. tit. 11, § 4.2(b), requires the Department to notify Licensees formally of the charges against them and to allow Licensees to subpoena witnesses, introduce evidence, and cross-examine witnesses. N.Y.Ins.Law §§ 109, 2110, 2127 (McKinney 1985). When the Hearings end, the Hearing Officers prepare findings of fact, conclusions of law, and recommendations for sanctions, subject to the Superintendent's review and approval. *See id.* at § 304.

If the Superintendent upholds the Hearing Officers' findings, the Department can suspend or revoke the Licensees' license or impose monetary penalties. The Licensee can challenge the Department's action in a New York court under Article 78, N.Y.Civ. Prac.L. & R., and obtain an automatic statutory stay of any suspension or revocation. N.Y.Ins.Law § 2124 (McKinney 1985).

According to the Brokers, the Department has conducted five disciplinary hearings against Licensees. In each case, the Hearing Officer recommended that the Department impose monetary penalties and revoke or suspend the Licensee's license. Corcoran has adopted the Hearing Officer's recommendations, without reviewing the hearing transcripts or exhibits.

*Standards Applicable to Summary Judgment Motions*

Summary judgment is authorized if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R. Civ.P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986);

*Corselli v. Coughlin*, 842 F.2d 23 (2d Cir. 1988). All ambiguities are resolved against the moving party, and all favorable inferences are drawn in favor of the party against whom summary judgment is sought. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970); *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir.1989); *Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 249 (2d Cir.1985), *cert. denied*, 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987).

The Supreme Court recently has made clear that "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *see also Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 58 (2d Cir. 1987). Summary judgment is permissible only in circumstances where "the evidence is such that a reasonable jury could not return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.

However, courts should not be reluctant to grant summary judgment in appropriate cases. "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually insupportable claims," *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986), thereby permitting courts to avoid "protracted, expensive and harassing trials." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.), *cert. denied*, 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985).

Rule 56(e) provides:

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

Fed.R.Civ.P. 56(e). Statements in affidavits not based on personal knowledge, *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 643 (2d Cir.1988), and arguments or statements by counsel unsupported by the record, *Beyah v. Coughlin*, 789 F.2d 986, 989–90 (2d Cir.1986), cannot raise a genuine issue of fact requiring a trial.

*Predetermination as a Denial of Due Process*

According to the Brokers, "the Superintendent and the Department have pre-determined the [Brokers' guilt], and the Defendants are acting out an elaborate charade to appear to comport with due process requirements." Plaintiffs' Mem. at 5. The Brokers cite the following factors to support this charge:

1) At the April 1 Meeting, Department representatives described the Licensees who had sold the Repair Agreements as "crooks" who deserved to lose their licenses.

2) Randolph said the appropriate punishment for the Licensees would be a "firing squad."

3) Altruda stated that all Licensees who sold the Repair Agreements would be disciplined.

4) Before each Hearing, Castiglione would "blue card" the Licensee, thereby preventing him from receiving a new license while the hearing was pending.

5) Hearing Officers recommended monetary penalties and license revocations or suspensions for all Licensees whose cases proceeded to a Hearing.

6) The Superintendent accepted the Hearing Officers' recommendations without reviewing the Hearing transcripts or exhibits.

To support their claim that the Defendants' purported prejudgment constituted bias violating due process, the Brokers rely upon the Supreme Court's opinion in *Gibson v. Berryhill*, 411 U.S. 564, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973), which involved a section 1983 challenge against license revocation hearings scheduled by Alabama's Board of Optometry (the "Board").

There, the Alabama Optometric Association (the "Association")—a professional organization comprised of self-employed optometrists—filed charges with the Board, alleging that optometrists who were salaried employees (the "Employees") of the Lee Optical Company ("Lee") had engaged in "unprofessional conduct." Among other things, the Association asserted that the Employees had aided and abetted Lee's alleged violation of an Alabama law that purportedly barred business corporations from operating optical departments.

Two days after the Association filed these charges, the Board commenced a state court lawsuit against Lee and the Employees to enjoin Lee from engaging in the "unlawful practice of optometry." After dismissing the Employees from the suit, the state court granted the injunction the Board had requested.

Upon prevailing in state court, the Board reactivated the proceedings arising out of the Association's complaint against the Employees. The Employees sued in federal court under 42 U.S.C. § 1983 to enjoin the hearings, and the district court issued an injunction, finding two elements of bias rising to the level of a due process violation.

The Supreme Court affirmed. Noting that the district court had found two sources of bias rising to the level of a due process violation ("prejudgment of the facts" and "personal interest"), however, the Court said: "Arguably, the District Court was right on both scores, but we need reach, and we affirm, only the latter ground of possible interest." *Id.* at 579, 93 S.Ct. at 1698. In a footnote, the Court added:

The extent to which an administrative agency may investigate and act upon the material facts of a case and then, consistent with due process, sit as an adjudicative body to determine those facts finally has occasioned some divergence of views among federal courts. We have no occasion to pass upon this issue here in view of our disposition of the present case.

*Id.* at 579 n. 17 (citations omitted).

The Supreme Court addressed the prejudgment issue two years later when it

decided *Withrow v. Larkin,* 421 U.S. 35, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975), which involved a 42 U.S.C. § 1983 suit by Larkin, a physician, to enjoin investigative and disciplinary proceedings commenced by Wisconsin's Examining Board (the "Board"), a state licensing body composed of practicing physicians.

Larkin first moved for a temporary restraining order ("TRO") to prevent the Board from holding investigative hearings (the "Investigation") to determine whether he had violated state law regulating physicians. The district court denied the motion for a TRO, and the Board proceeded with the Investigation. After it completed the Investigation, the Board notified Larkin that it had scheduled a "contested hearing" (the "Hearing") to determine whether to suspend his license temporarily, and Larkin moved for a TRO. The district court granted Larkin's motion, describing the issue presented as whether "for the board temporarily to suspend Dr. Larkin's license at its own contested hearing on charges evolving from its own investigation would constitute a denial to him of rights to procedural due process."

The Supreme Court reversed. Reasoning that a "biased decisionmaker [is] constitutionally unacceptable," *id.* at 47, 95 S.Ct. at 1464, the court described "various situations ... in which experience teaches that the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable." *Id.* These situations include "cases in which the adjudicator has a pecuniary interest in the outcome and in which he has been the target of personal abuse or criticism from the party before him." *Id.*

The Court also recognized that prejudgment can create bias, but only in limited circumstances:

> The contention that the combination of investigative and adjudicative functions necessarily creates an unconstitutional risk of bias in administrative adjudication has a much more difficult burden of persuasion to carry. It must overcome a presumption of honesty and integrity in those serving as adjudicators; and it

must convince that, under a realistic appraisal of psychological tendencies and human weakness, conferring investigative and adjudicative powers on the same individuals poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented.

*Id.; accord Touche Ross & Co. v. SEC,* 609 F.2d 570, 582 (2d Cir.1979).

To meet this burden, the plaintiff must establish a "specific foundation ... that the [agency] had been prejudiced by its investigation or would be disabled from hearing and deciding on the basis of evidence to be presented at the ... hearing." *Id.* 421 U.S. at 55, 95 S.Ct. at 1468. The fact that the decisionmaker may have expressed a belief publicly—after an investigation but prior to a hearing—that the plaintiff acted unlawfully does not establish bias. *See id.* at 48, 95 S.Ct. at 1465 (discussing *FTC v. Cement Inst.,* 333 U.S. 683, 700–01, 68 S.Ct. 793, 803–04, 92 L.Ed. 1010 (1948) (finding no bias where members of the FTC prior to FTC hearings testified before Congress that the cement industry's pricing practices were illegal)). Similarly, "[t]he mere exposure to evidence presented in nonadversary investigative procedures is insufficient in itself to impugn the fairness of the Board at a later adversary hearing." *Id.* 421 U.S. at 55, 95 S.Ct. at 1468. As the Court noted:

> It is ... very typical for the members of administrative agencies to receive the results of investigations, to approve the filing of charges or formal complaints instituting enforcement proceedings, and then to participate in the ensuing hearings. This mode of procedure does not violate ... due process of law.

*Id.* at 56, 95 S.Ct. at 1469.

Applying these principles to the facts in this record, the Brokers have failed to establish that the defendants' alleged prejudgment amounted to bias depriving the Brokers of due process.

### 1. Corcoran

The Brokers contend that they have been deprived of due process because Cor-

coran—who oversaw the Department's investigative and adjudicative efforts—had predetermined their guilt. However, the facts in the record regarding Corcoran's alleged prejudgment do not rise to the level *Withrow* requires for a finding of unconstitutional bias.

*Withrow* recognizes that no due process violation occurs simply because investigative and adjudicatory functions rest with the same body or person. *See id.* at 47, 95 S.Ct. at 1464–65. Accordingly, the fact that both the Bureau and Counsel report to Corcoran or that Bureau employees may have discussed the results of the investigation of the Licensees with Corcoran does not constitute bias.

Moreover, the Brokers offer no evidence that "a realistic appraisal of psychological tendencies and human weakness," *id.* at 47, 95 S.Ct. at 1464, demonstrates Corcoran's bias. The record contains no facts indicating that Corcoran has taken a position regarding the Licensees' guilt or innocence, although that alone would not violate due process. *See id.* at 48, 95 S.Ct. at 1465; *Cement Inst.*, 333 U.S. at 700–01, 68 S.Ct. at 803–04. In addition, the stronger statements in the record—for example, that the Licensees are "crooks" who should be punished by a "firing squad"—are not attributable to Corcoran.

The Brokers argue that Corcoran's practice of adopting the Hearing Officers' recommendations without reviewing the transcript or exhibits establish bias. However, nothing in the statute governing Hearing Officers and their reports requires the Superintendent to review the record underlying a Hearing Officer's report.[1] Indeed, common sense dictates otherwise. If the Superintendent reviewed the record underlying every disciplinary hearing conducted by the Department, he would have little time for anything else. Delegation is an invaluable principle in administrative practice, and it certainly cannot support an allegation of bias.

## 2. The Other Individual Defendants

The Brokers have established that some of the Individual Defendants or other Department employees—except Corcoran—strongly believed the Brokers had violated the insurance law and deserved to be disciplined. Department representatives called the Brokers "crooks," Randolph said a "firing squad" would be appropriate punishment, Altruda stated that all Licensees who sold Repair Agreements should be disciplined, and Castiglione "blue carded" Licensees before their Hearings.

Were these individuals Hearing Officers, a factual issue regarding prejudgment might exist. However, only Counsel's senior attorneys served as Hearing Officers. Silver, Castiglione, and Di Piazza worked for the Bureau, not Counsel. Minkowitz was the head of Counsel, but he never served as a Hearing Officer against the Licensees and he since has left the Department. Although the complaint makes other unnamed Department employees defendants, the Brokers have not identified these individuals as Hearing Officers. Moreover, to the extent these unnamed persons participated in the AMC investigation, New York Insurance Regulations would bar them from serving as Hearing Officers. N.Y.Comp.Codes R. & R. tit. 11, § 4.2(b).

No due process violation arises from the fact that the AMC investigation convinced some Department employees that the Brokers should lose their licenses. At most this reflects prosecutorial zeal, a virtue that serves the public interest in having the Department vigorously enforce the insurance laws. However, even if this zeal rose

---

1. The pertinent parts of the statute provide:

    (a) Unless otherwise provided in this chapter, any hearing pursuant to this chapter may be held before the superintendent, any deputy superintendent, or any designated salaried employee of the department authorized by the superintendent for such purpose.

    (b) The person conducting such hearing shall have power to administer oaths, examine and cross-examine witnesses and receive documentary evidence, and shall report his findings, orally or in writing, to the superintendent with or without recommendation. Such report, if adopted by the superintendent or by his authority may be the basis of any determination made by the superintendent or by his authority.

    N.Y.Ins.Law § 304 (McKinney 1985).

to the level of "predetermination," the Brokers still would enjoy due process. No matter how vigorous the investigation or prosecution, the Brokers had the opportunity to present their arguments to Hearing Officers having no connection with the AMC investigation. As the Supreme Court noted, there is "a presumption of honesty and integrity in those serving as adjudicators." *Withrow,* 421 U.S. at 47, 95 S.Ct. at 1464. The Brokers have presented no facts to overcome that presumption.

*Conclusion*

For the reasons set forth above, the motion for summary judgment is granted, dismissing the complaint with prejudice and with costs. Submit judgment on notice.

It is so ordered.