RIPPLE, Circuit Judge,
concurring.
My colleagues have attempted to cabin narrowly their holding. Noting that the District of Columbia Circuit has held squarely that any “personnel action” that interferes with decisional independence is remediable, if at all, through the administrative mechanisms of the Civil Service Reform Act (“CSRA”), see Mahoney v. Donovan, 721 F.3d 633, 636 (D.C.Cir.2013), they stress that this circuit simply holds today that the administrative law judges’ remedy under the Administrative Procedures Act (“APA”) for interference with their decisional independence does not extend to the incidental consequences of a bona fide production quota.
Placing a decision interpreting the gnarled intersection of two statutory schemes on narrow grounds is, in most instances, a commendable path. I am skeptical, however, about the appropriateness of such an approach in this situation and write to set forth the reasons for my skepticism.
If, as the court intimates, only bona fide personnel actions that tread incidentally on decisional independence are exempted from the strictures of the APA, we must be prepared to undertake the gargantuan task of determining, every time a decisional independence allegation is made, whether the governmental action is taken in good faith. The statutory scheme lacks, of course, any such “bona fides” criterion— and for good reason. It would require judges to dig into the subjective intent of executive and agency officials. It is difficult to imagine how such an inquiry would be compatible with Congress’s manifest intent in the CSRA to limit judicial intrusion into the day-to-day management of executive and regulatory government.
Moreover, the approach taken by the court today is in significant tension with the doctrinal path hewed by the Supreme Court and this circuit — a path that cuts a far broader path for the scope of the CSRA.
I will discuss both of these reservations in turn.
A.
The Supreme Court has addressed on several occasions the preemptive effect that the CSRA has with respect to complaints by federal employees about employment matters. See Elgin v. Dep’t of the Treasury, — U.S. -, 132 S.Ct. 2126, 183 L.Ed.2d 1 (2012); United States v. Fausto, 484 U.S. 439, 108 S.Ct. 668, 98 L.Ed.2d 830 (1988). In Fausto, the Court considered whether a nonpreference excepted service employee could challenge his suspension in the United States Claims Court, even though the CSRA did not then afford him a right to review in either the Merit Systems Protection Board (“MSPB”) or the Federal Circuit. The Court held that
[t]he comprehensive nature of the CSRA, the attention that it gives throughout to the rights of nonpreference excepted service employees, and the fact that it does not include them in provisions for administrative and judicial review contained in Chapter 75, combine to establish a congressional judgment that those employees should not be able to demand judicial review for the type of *407 personnel action covered by that chapter.
Fausto, 484 U.S. at 448, 108 S.Ct. 668.
The Court’s more recent pronouncement on the CSRA, Elgin, concerned former federal employees who had failed to comply with the Selective Service Act and were therefore discharged by their employing agencies. See 132 S.Ct. at 2131. One of the former employees, Elgin, appealed his removal to the MSPB and argued that the selective service requirement was unconstitutional. The MSPB referred the issue to an ALJ for initial decision, and the ALJ dismissed the appeal for lack of jurisdiction, “concluding that an employee is not entitled to MSPB review of agency action that is based on an absolute statutory bar to employment.” Id. Elgin did not petition for review by the full MSPB, nor did he appeal to the Federal Circuit. Instead, he filed suit in district court seeking a declaratory judgment that the challenged statute was unconstitutional; he also requested reinstatement, back-pay, benefits, and attorneys’ fees.
Before the Supreme Court, Elgin argued that the grant of general federal question jurisdiction, 28 U.S.C. § 1331, provided authority for the district court to entertain his action. The Court disagreed. Analogizing the ease before it to Fausto, the Court stated:
Just as the CSRA’s “elaborate” framework demonstrates Congress’ intent to entirely foreclose judicial review to employees to whom the CSRA denies statutory review, it similarly indicates that extrastatutory review is not available to those employees to whom the CSRA grants administrative and judicial review. Indeed, in Fausto we expressly assumed that “competitive service employees, who are given review rights by Chapter 75, cannot expand these rights by resort to” judicial review outside of the CSRA scheme. As Fausto explained, the CSRA “prescribes in great detail the protections and remedies applicable to” adverse personnel actions against federal employees.... Given the painstaking detail with which the CSRA sets out the method for covered employees to obtain review of adverse employment actions, it is fairly discernible that Congress intended to deny such employees an additional avenue of review in district court.
Id. at 2133-34 (citations omitted) (quoting Fausto, 484 U.S. at 443, 450 n. 3, 108 S.Ct. 668).
We also have considered the scope of the CSRA’s preemptive effect on at least two occasions and reached decisions’ compatible with the Supreme Court’s decisions. In Paige v. Cisneros, 91 F.3d 40 (7th Cir.1996), a HUD attorney had challenged his discharge in district court. The district court held that the plaintiffs administrative hearing was constitutionally inadequate and remanded for further proceedings. The plaintiff appealed, however, arguing that once the court had determined that there was a constitutional violation, it should not have remanded the matter to HUD. We determined that “the district court lacked authority to remand the case to HUD, but for a different reason: It hadn’t subject matter jurisdiction. By the [CSRA], Congress gave exclusive jurisdiction over civil service personnel disputes to 'the Merit Systems Protection Board (MSPB).” Id. at 42 (citation omitted). We further explained:
Since Paige could not appeal to the MSPB, the district court thought it appropriate to order the creation of a parallel administrative apparatus through which he could challenge his termination. This action was unwarranted because it failed to accord respect to the administrative system established by *408 statute for reviewing federal personnel actions. A statute providing for review of some claims but not others means that the “others” (like Paige’s) don’t receive review; it does not mean that judges should disregard the exclusions and order the agency to provide a comparable administrative review anyway.
Id. at 42-43.
We reached a similar decision in Richards v. Kiernan, 461 F.3d 880 (7th Cir.2006). Richards, a former ATF employee, “brought suit against his supervisors alleging that they violated his First Amendment rights by retaliating against him for his whistleblowing activities”; indeed, he had resigned his position citing a hostile work environment. Id. at 882. He first filed a formal complaint of discrimination with the ATF, which was denied. He then turned to the Office of Special Counsel. That claim and the appeal also failed. Richards then filed a complaint in the district court alleging constructive discharge and retaliation; he voluntarily dismissed that action, however, to pursue claims through the MSPB. “The MSPB held that it lacked jurisdiction over Richards’ discharge claim, concluding that he had voluntarily retired, and denied the whistle-blower claim finding that Richards had not made any protected disclosures.” Id. at 883. Rather than appealing that adverse ruling to the Federal Circuit, Richards reinstated his First Amendment claim in the district court. The district court dismissed for lack of jurisdiction, and we affirmed, explaining that, “[b]y creating the CSRA, Congress implicitly repealed the jurisdiction of federal district courts over personnel actions arising out of federal employment.” Id. Moreover, the fact that Richards was asserting a constitutional challenge did not change the analysis.
In short, a conclusion that the federal courts lack jurisdiction over any claim of interference with decisional independence falls squarely within the extant jurisprudence on the subject. Today’s opinion establishes a different framework, and, although it does not alter the result, it sets us up to travel a different and highly problematic road in the future.
B.
The majority suggests that the administrative law judges, if they are able to show a lack of bona fides, can challenge departmental or agency action trenching on their decisional independence. Although I am skeptical that the CSRA permits them to pursue such a course, I also believe that even the absence of a judicial remedy does not mean that there is an absence of a constitutional violation. Rather, it simply means that Congress has not seen fit to entrust such a systemic issue to the administrative or judicial process.
Despite the lack of judicial redress, both statutory design[1] and, to some degree, constitutional imperative,[2] require that the *409 integrity of the administrative judges’ decision-making process be respected. It is very possible that executive or administrative authorities can so burden the exercise of that judicial decision-making process that the congressional intent of protecting the administrative law judges can be fundamentally impaired. Such an impairment, should it occur, is far more than an “incidental and undesired effect,” Maj. Op. 405, of the adjudicative process. Congress, under the present scheme, apparently has decided to leave the decision as to whether such a systemic impairment is occurring to its own scrutiny — and perhaps the scrutiny of the courts if a litigant should ever raise it as a matter of due process of law (a seemingly gargantuan task).
Serious impairment of a governmental function can occur at the hands of officials with the most worthy of motives. The integrity of the judicial function, at any level of adjudication, can be undermined seriously by even the most benignly motivated administrative or executive action that alters the essential function of adjudication. Officials charged with the responsibility “to get the job done” must devise methods and measures for achieving that goal. Devising such tools always requires, however, balancing considerations of efficiency with respect for the core functions of the governmental unit involved — here the adjudication of cases.
The administrative adjudicative process is a vital part of our system of administering justice in today’s United States. Indeed, it is in the administrative process that most Americans have any contact with the American justice system. Here, their Government decides whether their elderly family members will receive a steady, albeit basic, income stream in their old age. Here, those in their family who have the misfortune of coping with a physical or psychiatric disability find whether they are eligible for sufficient support to live in some semblance of economic dignity. Administrative law judges affect directly the lives of millions; the quality of their work deeply affects, moreover, the respect that our people have for our system of justice. The rights of Americans are not processed by our judges; they are adjudicated. The task of adjudication at the administrative level involves an intimate knowledge of a complicated statutory scheme and the capacity to comprehend and analyze technical and, at times, conflicting statutory material. The judge must have the practical wisdom to evaluate the value of testimony, some of it true, some of it untrue, and some of it simply mistaken. Even though we review the decisions of these officers under a deferential standard, we know well that these analytical and evaluative tasks alone are time-consuming and demand great attention to detail.
Finally, I cannot accept even the slightest intimation that the exercise of legislative power, even with the most benign of motivations, could not constitute a significant constitutional impairment of our own work. That the courts of the Third Article cannot be burdened with non-adjudicatory responsibilities has long been established.[3] *410 I see no reason why we should take as a given that those same courts ever can be similarly impaired by being deprived of the tools necessary to achieve their assigned task with integrity.[4]
With these considerations in mind, I am pleased to join the judgment of the court.

. See Butz v. Economou, 438 U.S. 478, 513, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978) (‘‘[T]he process of agency adjudication is currently structured so as to assure that the hearing examiner exercises his independent judgment on the evidence before him, free from pressures by the parties or other officials within the agency.”).

. See Gibson v. Berryhill, 411 U.S. 564, 579, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973) (holding that, in evaluating the licensure decision of a state administrative board, “[i]t is sufficiently clear from our cases that those with substantial pecuniary interest in legal proceedings should not adjudicate these disputes”); see also Ward v. Vill. of Monroeville, 409 U.S. 57, 60, 93 S.Ct 80, 34 L.Ed.2d 267 (1972) (holding that a quasi-judicial official cannot, consonant with due process, act as a decisionmaker when he is placed in a situation “which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or *409 which might lead him not to hold the balance nice, clear and true between the State and the accused” (internal quotation marks omitted)); Turney v. Ohio, 273 U.S. 510, 522, 47 S.Ct. 437, 71 L.Ed. 749 (1927) ("That officers acting in a judicial or quasi-judicial capacity are disqualified by their interest in the controversy to be decided is, of course, the general rule.”).

. "As a general rule, we have broadly stated that 'executive or administrative duties of a nonjudicial nature may not be imposed on judges holding office under Art. Ill of the Constitution.’ ” Morrison v. Olson, 487 U.S. 654, 677, 108 S.Ct. 2597, 101 L.Ed.2d 569 *410 (1988) (quoting Buckley v. Valeo, 424 U.S. 1, 123, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976)); see also United States v. Feireira, 54 U.S. (13 How.) 40, 48-51, 14 L.Ed. 40 (1852); Hayburn’s Case, 2 U.S. (2 Dall.) 409, 411, 1 L.Ed. 436 (1792).

. See Hon. Deanell Reece Tacha, Independence of the Judiciary for the Third Century, 46 Mercer L.Rev. 645, 648 (1995) ("In order for a judge to handle her caseload and maximize productivity, she implicitly must possess adequate staff, equipment, and physical facilities to carry out her responsibilities. Independent judicial action requires an appropriate level of support which allows a judge to carry out the judicial function without relying on other entities, depending on someone else's assessment of the judge’s needs, or giving any thought in the case-deciding role to tangential factors that might influence the speed of deliberation or the outcome.”).